**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **YOLAINA WASHINGTON-POPE,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA et al.,** | : | **No. 12-4300** |
| **Defendants.** | : | |

## M E M O R A N D U M

PRATTER, J.                                                                                    OCTOBER 22, 2013

Officer Yolaina Washington-Pope's harrowing ordeal raises the question of whether an on-duty, in-uniform police officer, who raises his service weapon to his partner's temple as their exchange of words in their police cruiser rapidly escalates, acts under color of state law for purposes of 42 U.S.C. § 1983. Although the facts of this case and Ms. Washington-Pope's experiences are doubtlessly distressing, the Third Circuit Court of Appeals' precedent, the acknowledged purposes of § 1983, and more analogous case law from other courts constrain this Court to answer that question in the negative. This case serves as a sobering reminder that federal law does not provide a remedy for every wrong or even every horrifying injury.

Because Officer Washington-Pope's ex-partner and now-Defendant Officer William Bailey did not act under color of state law when he drew his gun on her, as discussed in greater detail below, the Court grants his Motion for Summary Judgment and dismisses the claims against him with prejudice. The Court also denies the City of Philadelphia's Motion to Dismiss, with prejudice only as to the City's argument concerning independent municipal liability raised in Section C of the its Memorandum.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to Federal Rule of Civil Procedure 56, the Court canvasses the material facts and construes all reasonable inferences from them in favor of Plaintiff Ms. Washington-Pope, the nonmovant. As a result, the operative facts for present purposes are as follows.

Soon after Philadelphia Police Officers Bailey and Washington-Pope began driving to the scene of a domestic dispute, their first assignment during the graveyard shift on September 24, 2010, Officer Bailey, who was driving, stopped the car, got out, and looked under it and then in the trunk. Puzzled, Officer Washington-Pope asked him what was wrong. Officer Bailey said he had heard noises, though she had not. Back in the car, the partners reached their destination and when no one answered the door, they headed to their second assignment.

After concluding their second assignment without incident, the officers began cruising toward their third. But Officer Bailey drove in the wrong direction and began slowing down before speeding back up while looking in the side-view mirror. He then stopped the car, put it in reverse, and slowly backed up. When Officer Washington-Pope asked him what he saw, he claimed that the "car behind us is following me. Every time I slow down they slow down and every time I speed up they speed up; look at them, they are backing up like me." Officer Bailey turned the police cruiser around and the vehicle behind them continued down the street away from them.

At about this point, Officer Washington-Pope remembered a conversation she had had with another officer about a time that Officer Bailey had reportedly behaved oddly. According to the other officer, Officer Bailey had refused to get out of his police car after a tour of duty until a lieutenant approached him, at which point Officer Bailey sprang from the vehicle and ran around the parking lot, pursued by other officers. According to her deposition testimony, Officer

Washington-Pope did not know, on the night of September 24, 2010, whether Officer Bailey's strange behavior had occurred because he had diabetes or he was otherwise ill.

With this hazy hearsay story in mind on September 24, 2010, Officer Washington-Pope turned to Mr. Bailey and asked him whether he had taken his medication. He responded, "And what medication would that be?" She retorted, sarcastically, "Your psychotic meds," and then, "Your sugar medication."

"No, I did not," he responded, while pointing his finger at her. By now, Officer Bailey was again driving past the address of their third assignment, and at some point Officer Washington-Pope told him to turn around. Officer Bailey said, "Why would you ask me that?"

"Because you're f—ing tripping," said Officer Washington-Pope.

Officer Bailey: "You got a problem with me?"

Officer Washington-Pope: "Yeah, you're f—ing tripping."

Officer Bailey, pulling up to the corner and about to make a left: "Say it again." He unsnapped his holster.

Officer Washington-Pope, not looking at Officer Bailey, but rather down at the paperwork she was writing: "You're f—ing tripping."

Officer Bailey put his service weapon in his lap and, turning the corner towards the address of their third assignment, said, "I bet you won't say it again." Turning to face him, Officer Washington-Pope stared into the barrel of Officer Bailey's gun and saw his "cold," "mean look."

The words, "You're f—ing tripping," were again at the tip of her tongue, but something clicked in her mind at that moment, and she realized it was time for her to "stop playing." She remembered then that it was not unusual for Officer Bailey to take things too far or handle

matters with a "violent undertone"—although she could not understand why he had drawn his gun on her.

Thinking she might escape from the car, Officer Washington-Pope tried the door handle, but she could not release the lock. She thought she might draw her own gun, but because of her vest and position she thought the effort would be futile. She considered tasing Officer Bailey, but worried that even if she could, his muscles might involuntarily tense and his finger, flinching, pull the trigger. So she exercised the one option she thought she had left.

"Bailey, you really gonna point a gun at me, really?" Officer Bailey said nothing. "Bailey, you really going to shoot me? Is that what you're going to do?" He still said nothing. She repeated the words, which he met with silence and what Officer Washington-Pope described as an empty, menacing stare.

And then, although Officer Washington-Pope did not say how much time passed, Officer Bailey holstered the gun and asked, "Now, what now?"

The two continued on to their next assignment.

*   *   *

The early morning's events of September 24, 2010, had not yet drawn to a close. Officer Washington-Pope attempted to get into the driver's seat or, barring that, to convince Officer Bailey to drive back to headquarters so she could deal with what had happened. At first he refused and instead took off after a driver who he had seen run a red light and who turned out to be under the influence. According to Officer Washington-Pope, Officer Bailey behaved oddly toward the suspect, but soon Officer Washington-Pope was finally able to prevail on him to drive back to headquarters. After they arrived, Officer Bailey began hitting his vest and arguing with it,

and only by convincing him that she was helping to fix his vest was Officer Washington-Pope able to disarm him. Then she drove him to the hospital.

Mr. Bailey has had type I diabetes since he was nine years old, and has experienced hypoglycemic episodes that, according to the parties' experts, can lead to odd behavior. The parties, through their experts, dispute whether Officer Bailey was experiencing such an event at the moment he drew his gun on Officer Washington-Pope, as well as whether, if he was, he could have formed, and did form, the intent to do so. Mr. Bailey also claims that he does not remember drawing his gun on Ms. Washington-Pope, although she contends that he does.

*   *   *

Ms. Washington-Pope sued Mr. Bailey and the City of Philadelphia under 42 U.S.C. § 1983. In the first count of her First Amended Complaint, Ms. Washington-Pope alleged that Officer Bailey had violated her rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution by unlawfully and unreasonably seizing her at gunpoint and causing her significant mental anguish and emotional distress, as well as medical expenses, loss of future earnings, and other injuries. In the second count, she alleged that the City, knowing of Officer Bailey's diabetes and his violent tendencies, also knew that Ms. Washington-Pope was at risk of being assaulted by him. She contends that the City was deliberately indifferent to the conduct of Officer Bailey as well as other police officers with regard to their responsibility to supervise Officer Bailey, who was not physically or mentally fit to serve as a Philadelphia Police Officer. Because Officer Bailey violated her rights to liberty, bodily integrity, and freedom from unreasonable search and seizure, Ms. Washington-Pope alleges, the City's deliberate indifference to the risk of his actions renders it independently liable under § 1983 for violating her substantive due process rights.

After he moved for and received an extension of time to file his Answer, Mr. Bailey instead moved for summary judgment. The City answered on October 15, 2012. Ms. Washington-Pope responded to Mr. Bailey's Motion for Summary Judgment and, following an initial pretrial conference, the Court denied Mr. Bailey's Motion for Summary Judgment in order to give the parties time to conduct discovery. The Court ordered that the deadlines then set "pertain[ed only] to discovery and briefing related to the issues discussed in Mr. Bailey's Motion for Summary Judgment" (Docket No. 12 at 1 n.1).

After several months of discovery, Mr. Bailey again moved for summary judgment. The City followed his lead and also moved for summary judgment. Ms. Washington-Pope responded separately to Mr. Bailey's second Motion for Summary Judgment and to the City's. In her response to the City, Ms. Washington-Pope explained that because discovery under the Court's prior order "was limited to claims only against Defendant, Officer Bailey, Plaintiff was surprised when Defendant, City of Philadelphia, filed a Motion for Summary Judgment three days after Defendant, Officer Bailey, filed his second motion." Washington-Pope–City Mem. at 4 (Docket No. 19). Her counsel contacted the City's counsel, who sent a letter to the Court, requesting that the Court consider only Section C of its Motion. Consequently, Ms. Washington Pope's response here addresses only the City's Section C argument, namely, that municipal liability depends on a violation of a plaintiff's constitutional rights such that "[i]f this honorable court dismisses Plaintiff's claims against Officer [Bailey] then the claims against the City of Philadelphia must also be dismissed." City Mem. at 20-21 (Docket No. 17). Accordingly, as to the City, the Court will consider only Section C of the City's Motion for Summary Judgment.

## II.	STANDARD OF REVIEW

Upon motion of a party, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment should be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988). A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). Further, a court may not weigh the evidence or make credibility determinations. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). Nevertheless, the party opposing summary judgment must support each essential element of his or her opposition with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Of course, the court may grant summary judgment if the plaintiff's version of the facts, as a matter of law, do not entitle her to relief: "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

## III.     DISCUSSION

The two motions for summary judgment raise separate issues. First, Officer Bailey contends that Officer Washington-Pope's § 1983 claim against him should be defeated for several reasons. He argues that (a) he was not acting under color of law when he pointed his gun at Officer Washington-Pope's head, Bailey Mem. at 3-7 (Docket No. 16); (b) in the alternative, he did not act intentionally and so could not have "seized" Officer Washington-Pope under the meaning of the Fourth Amendment, *id.* at 7-14; (c) that Officer Washington-Pope's Fourteenth Amendment substantive due process claim must be dismissed because the case must be analyzed under the Fourth Amendment, *id.* at 14; (d) Officer Washington-Pope's Fifth Amendment claim must be dismissed because the Fifth Amendment pertains only to federal actors, *id.* at 14; and (e) Officer Bailey is entitled to qualified immunity, *id.* at 15. Because the Court holds that Officer Bailey was not acting under color of law when he pointed his gun at Officer Washington-Pope's head, the Court need not consider his remaining arguments, and summary judgment in favor of Officer Bailey is appropriate.

Second, the City of Philadelphia raises the contingent argument that "[i]f this honorable court dismisses Plaintiff's claims against Officer [Bailey] then the claims against the City of Philadelphia must also be dismissed" because municipal liability depends on an individual officer's violation of a plaintiff's constitutional rights. City Mem. at 20-21. Although that reasoning has an aura of logic, in the Third Circuit independent municipal liability may stand under *Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994), as discussed below, even where no individual actor has violated the plaintiff's constitutional rights. Accordingly, the

City's Motion for Summary Judgment is denied, and the parties will have an opportunity to conduct additional discovery.

### A.    The Claims Against Officer Bailey: No Action Under Color of Law

Ms. Washington-Pope brings her suit under 42 U.S.C. § 1983. Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "It is for violations of such constitutional and statutory rights that 42 U.S.C. § 1983 authorizes redress; that section is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979); *accord City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985) (plurality opinion); *accord Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010). To be afforded a remedy in federal court under § 1983, a plaintiff must prove two elements. First, she must show a "violation of a right secured by the Constitution and laws of the United States." *West v. Atkins*, 487 U.S. 42, 48 (1988). Violations of the Fourth Amendment's prohibition of unreasonable seizures, *see generally, e.g.*, *Tennessee v. Garner*, 471 U.S. 1 (1985), or the Fourteenth Amendment's guarantee of substantive due process, *see generally, e.g.*, *Fagan v. City of Vineland (Fagan II)*, 22 F.3d 1296 (3d Cir. 1994) (en banc), satisfy the first prong of § 1983 as constitutional violations. *See, e.g.*, *Tuttle*, 471 U.S. at 816-17 ("Here respondent's claim is that her husband was deprived of his life 'without due process of law,' in violation of the Fourteenth Amendment, or that he was deprived of his right to be free from the use of 'excessive force in his

apprehension'—presumably a right secured by the Fourth and Fourteenth Amendments. Having

established a deprivation of a constitutional right . . . ." (footnote omitted)).

Second, she must "show that the alleged deprivation was committed by a person acting

under color of state law." *West*, 487 U.S. at 48. This state law requirement is identical to the

Fourteenth Amendment's state action requirement. *Rendell-Baker v. Kohn*, 457 U.S. 830, 838

(1982) (citing *United States v. Price*, 383 U.S. 787, 794 n.7 (1966)); *accord Kach v. Hose*, 589

F.3d 626, 646 (3d Cir. 2009); *Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 169-70 & n.1

(3d Cir. 2004) (Alito, J.). That the two are equivalent, of course, is readily apparent when the

conduct in question is alleged to violate the Fourteenth Amendment and, as incorporated through

the Fourteenth Amendment, the Fourth and Fifth Amendments.[1] *See Martinez v. Colon*, 54 F.3d

---

[1] The Fourteenth Amendment provides, in pertinent part: "No *state* shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall *any state* deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV, § 1 (emphasis added).

Because the Court holds that Officer Bailey did not act under color of state law, it is not necessary to address Ms. Washington-Pope's contention that she has a Fifth Amendment claim against him. Still, especially given that she also brings claims against the City, it is worth noting that to the extent that she contends that her Fifth Amendment claim sounds in substantive due process (the only plausible reading of her Complaint based on the facts presented), she must rely instead on the Fourteenth Amendment's Due Process Clause, which applies to state and local actors, rather than the Fifth Amendment's Due Process Clause, which applies to federal actors. *See Micklus v. Carlson*, 632 F.2d 227, 239 (3d Cir. 1980) ("[I]t is established practice for this Court to sustain the jurisdiction of the federal courts to issue injunctions to protect rights safeguarded by the Constitution and to restrain individual state (*and federal*) officers from doing what the 14th Amendment (*and Fifth amendment*) forbids the State (*and federal government*) to do." (emphasis added) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946), but omitting footnotes and adding, in parentheticals, language not present in *Bell*)). Notwithstanding the Third Circuit Court of Appeals' puzzling suggestion in *Metzger ex rel. Metzger v. Osbeck*, 841 F.2d 518, 520 (3d Cir. 1988), that "[a] decision to discipline a student, if accomplished through excessive force and appreciable physical pain, may constitute an invasion of the child's Fifth Amendment liberty interest in his personal security and a violation of substantive due process prohibited by the Fourteenth Amendment," the idea that the Fourteenth Amendment's Due Process Clause incorporates the Fifth Amendment's Due Process Clause is unsustainable because "the phrase 'due process of law' used in the Fourteenth Amendment to restrain action by the states means

980, 986 (1st Cir. 1995) ("To be sure, violence is attributable to state action if the perpetrator is acting under color of state law, but that is a virtual tautology." (citations omitted)); *cf. Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936 (1982) ("As a matter of substantive constitutional law the state-action requirement reflects judicial recognition of the fact that most rights secured by the Constitution are protected only against infringement by governments." (citation and internal quotation marks omitted)).

Thus, "[t]he ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell-Baker*, 457 U.S. at 838 (quoting *Lugar*, 457 U.S. at 937).

> The "fair attribution" question, in turn, has two components.
>
> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State. Without a limit such as this, private parties could face constitutional litigation

---

substantially the same as that phrase of the Fifth Amendment, restraining action by the federal government." *United States v. Johnson*, 129 F.2d 954, 958 (3d Cir. 1942) (citing *Hurtado v. California*, 110 U.S. 516, 535 (1884)); *see Hurtado*, 110 U.S. at 534-35 ("We are to construe this phrase [(due process)] in the fourteenth amendment by the *usus loquendi* of the constitution itself. The same words are contained in the fifth amendment. . . . The conclusion is . . . irresistible, that when the same phrase was employed in the fourteenth amendment to restrain the action of the states, it was used in the same sense and with no greater extent . . . ."). Recently, for instance, when cataloguing which Bill of Rights provisions are incorporated through the Fourteenth Amendment, the Supreme Court, although listing all those provisions incorporated and those three not incorporated, never once mentioned the Fifth Amendment's Due Process Clause. *See McDonald v. City of Chicago*, 130 S. Ct. 3020, 3034-35 & nn.12-13 (2010) (majority opinion).

Thus, unless Ms. Washington-Pope is alleging that Officer Bailey or the City violated her rights against takings, self-incrimination, or being placed in double jeopardy, *see McDonald*, 130 S. Ct. at 3034 n.12, the Fifth Amendment is irrelevant to her account of events.

> whenever they seek to rely on some state rule governing their interactions with
> the community surrounding them.

*Lugar*, 457 U.S. at 937. These two questions, which at times may "collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions," are not the same. *Id.*

Often, when a state or local employee acts in his official capacity, he will be found to have done so under color of state law. *West*, 487 U.S. at 49-50; *Barna v. City of Perth Amboy*, 42 F.3d 809, 816 (3d Cir. 1994). Such may be the case even for off-duty law enforcement officers who purport to act under their state or local authority. In these cases, both of the "under color of law" conditions are satisfied: the actors (1) purport to act under "some right or privilege created by the state" and (2) they are state or local officials, such that their "conduct is . . . chargeable to the State." *Lugar*, 457 U.S. at 937. In essence, when the actor is a law enforcement official, the second element is satisfied, and so whether his action is fairly attributable to the state depends on the answer to the first question—whether his actions are "caused by the exercise of some right or privilege created by the State," *id.*, or whether, in undertaking them, he "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer [was] clothed with the authority of state law,'" *West*, 487 U.S. at 49 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). Clearly then—and indeed, it is well settled that—"a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West*, 487 U.S. at 50.

It is also "firmly established that a defendant in a § 1983 suit acts under color of state law when he *abuses* the position given to him by the State." *Id.* at 49-50 (emphasis added); *accord Barna*, 42 F.3d at 816. Were this not the case, then logically an officer could be held liable under

§ 1983 only when a state statute, regulation, or policy by its terms actually authorized him to violate the Constitution. Instead,

> [a]cts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it. If . . . the statute was designed to embrace only action which the State in fact authorized, the words "under color of any law" were hardly apt words to express the idea.

*Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality opinion). For this reason, his misuse of power, so long as he in fact possesses state power, brings the law enforcement officer under the reach of § 1983.

The limiting principle, however, is that "under 'color' of law means under 'pretense' of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded." *Id.* While an off-duty sheriff working as a private security guard but wearing his official uniform and displaying his badge acts under color of law when he excludes a plaintiff from a park and then arrests him for criminal trespass on account of race acts under color of law, *see Griffin v. Maryland*, 378 U.S. 130, 131-36 (1964), "a police officer's purely private acts which are not furthered by any actual or purported state authority are not acts under color of state law," *Barna*, 42 F.3d at 816. The question, which can be rephrased as an inquiry into when an officer's actions become private, is a difficult one precisely because it involves not a simple determination of whether the officer had state authority, but whether he "purport[ed] to act under that authority," even if "he might have taken the same action had he acted in a purely private capacity." *Griffin*, 378 U.S. at 135; *accord Barna*, 42 F.3d at 816.

Following the Supreme Court's guidance in *Griffin v. Maryland*, 378 U.S. 130, the Third Circuit Court of Appeals has explained that "[m]anifestations of such pretended authority may include flashing a badge, identifying oneself as a police officer, placing an individual under arrest, or intervening in a dispute involving others pursuant to a duty imposed by police

department regulations." *Barna*, 42 F.3d at 816. Courts look for such "indicia of police authority," although the indicia must be considered together in context to determine whether an officer purported to act under pretense and therefore under color of law, rather than as per se determinants that he did so. *See id.* at 817, 818 & n.11.

Such factors often deemed relevant but not per se determinative include: whether the defendant officer was on duty, *West*, 487 U.S. at 50 ("[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."); *Bonenberger v. Plymouth Township*, 132 F.3d 20, 24 (3d Cir. 1997) ("[O]ff-duty police officers who flash a badge or otherwise purport to exercise official authority generally act under color of law."); whether the officer was pursuing purely private motives by means of exercising state authority, *Basista v. Weir*, 340 F.2d 74, 80-81 (3d Cir. 1965) ("Assuming arguendo that Scalese's actions were in fact motivated by personal animosity that does not and cannot place him or his acts outside the scope of Section 1983 if he vented his ill feelings towards Basista . . . under color of a policeman's badge."), or in an "interaction with the victim [that was] unconnected with his execution of official duties" and therefore not "under color of law," *Bonenberger*, 132 F.3d at 24; whether the officer's actions were related to his job as a police officer, *see Barna*, 42 F.3d at 816; whether the officer's actions occurred within his jurisdiction, *see Barna*, 42 F.3d at 816-17; whether the officer identified himself as a police officer, *see Griffin*, 378 U.S. at 135; whether he wore police clothing, *see Griffin*, 378 U.S. at 135; *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999), or showed a badge, *see Griffin*, 378 U.S. at 135; *Bonenberger*, 132 F.3d at 24; *Barna*, 42 F.3d at 816; whether he used or carried a service weapon, e.g., a gun or nightstick, *Barna*, 42 F.3d at 817, or used a police car or other police equipment, *see, e.g.*, *Rodriguez v. City of Paterson*, No. 94-988, 1995 WL 363710, at *3

(D.N.J. June 13, 1995) (police radio); and whether the officer attempted to arrest the victim, *see Griffin*, 378 U.S. at 135; *Abraham*, 183 F.3d at 287.

But "[w]hile certain factors will clearly be relevant" in any given case—"for example, a police officer's garb, an officer's duty status, the officer's use of a service revolver, and the location of the incident—these factors must not be assessed mechanically." *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 45 (1st Cir. 1999); *see K.K. ex rel. Knowles v. Weeks*, No. 04-2290, 2007 WL 1455888, at *12 (M.D. Pa. May 15, 2007) ("To determine whether there is a genuine issue of material fact as to Weeks's abuse of his position as a PSP officer, we must examine the totality of the circumstances of the abusive conduct as well as the use of any indicia of state authority."); *Jackson-Gilmore v. Dixon*, No. 04-03759, 2005 WL 3110991, at *10 (E.D. Pa. Nov. 18, 2005) ("Courts look to all of the officer's acts, and to no one act in particular, in context, to determine whether an officer was acting in his official capacity and whether the officer invoked police authority."); *Pryer v. City of Philadelphia*, No. 99-4678, 2004 WL 603377, at *4 (E.D. Pa. Feb. 19, 2004) ("The Third Circuit looks to *all* of the acts of the officer, and no one act in particular, in context, to determine whether an officer was acting in his or her official capacity and whether the officer invoked police authority." (citing *Barna*, 42 F.3d at 818)); *see also Anderson v. Warner*, 451 F.3d 1063, 1068 (9th Cir. 2006) ("There is no 'rigid formula' for determining whether a state or local law official is acting under color of state law."); *Strange v. Porath*, 104 F.3d 368, at *3 (10th Cir. 1996) (table opinion) ("When courts have applied the color of law requirement to the conduct of off-duty police officers, a single factor is rarely determinative. Rather, the courts have tended to use a totality of the circumstances approach in their formulation."); *David v. City and County of Denver*, 101 F.3d 1344, 1353 (10th Cir. 1996) ("The under color of law determination rarely depends on a single, easily identifiable fact, such

as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty." (citing *Martinez*, 54 F.3d at 986)); *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994) ("More is required than a simple determination as to whether an officer was on or off duty when the challenged incident occurred." (collecting cases)); *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975) ("The fact that a police officer is on or off duty, or in or out of uniform is not controlling. 'It is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer has acted under color of law.'" (quoting *Johnson v. Hackett*, 284 F. Supp. 933, 937 (E.D. Pa. 1968)); *Gueits-Colón v. de Jesús*, 177 F. Supp. 2d 128, 135 (D.P.R. 2001) ("These factors, however, should not be applied in a simplistic or mechanical formula. No single factor will be dispositive in a determination of whether an officer was acting under color of state law."); *Morton v. City of Albany*, No. 08-1304, 2009 WL 2568595, at *5-6 (N.D.N.Y. Aug. 19, 2009); *Lizardo v. Denny's, Inc.*, No. 97-1234, 2000 WL 976808, at *16 (N.D.N.Y. July 13, 2000) ("Plaintiffs rest their argument that Adams' and Paninski's actions constitute actions taken under color of state law on the fact that they were armed and wearing their duty uniforms at the time. That fact alone is not however dispositive." (citing *Martinez*, 54 F.3d at 986)), *aff'd*, 270 F.3d 94 (2d Cir. 2001).

As the First Circuit Court of Appeals has explained in *Martinez v. Colon*, the leading case for "under color of law" analysis of police-on-police altercations, special circumstances, not unlike many of those applicable here, need to be carefully considered:

> [N]ot every action undertaken by a person who happens to be a police officer is attributable to the state. Though "under 'color' of law means under 'pretense' of law," even so, the acts of state officials "in the ambit of their personal pursuits" are not state action. *Screws*, 325 U.S. at 111; see also *Gibson* [*v. City of Chicago*], 910 F.2d [1510,] 1518 [(7th Cir. 1990)]. Accordingly, a policeman's private conduct, outside the line of duty and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law. *See Barna v. City of Perth Amboy*, 42 F.3d 809, 816 (3d Cir. 1994); *United States v. Tarpley*,

945 F.2d 806, 809 (5th Cir. 1991); *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 479 (9th Cir. 1991); *Murphy v. Chi. Transit Auth.*, 638 F. Supp. 464, 467 (N.D. Ill. 1986); *Johnson v. Hackett*, 284 F. Supp. 933, 937 (E.D. Pa. 1968). Even though "acting under color of law" includes "acting under pretense of law" for purposes of a state action analysis, *there can be no pretense if the challenged conduct is not related in some meaningful way either to the officer's governmental status or to the performance of his duties*.

*Martinez*, 54 F.3d at 986-87 (emphasis added).

The Third Circuit Court of Appeals is in agreement. More recently, it has instructed that "[t]o determine whether a police officer acted under the color of state law, the facts and circumstances of the police officer's role . . . must be examined in their totality. . . . The state action question must be addressed after considering the totality of the circumstances and cannot be limited to a single factual question." *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 610-11 (3d Cir. 2011). "The key determinant is whether the actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law." *Martinez*, 54 F.3d at 986. Thus, it is important not only to enumerate the relevant factors, but also to discuss the leading cases in the Third Circuit, in which the Court of Appeals considered whether conduct directed by police officers toward private individuals was under color of law, before turning to the more analogous, and therefore instructive, cases from the First Circuit Court of Appeals, which has, consistent with Third Circuit case law and principles, extended the analysis to police-on-police altercations.

### 1.    Third Circuit Case Law

In *Barna v. City of Perth Amboy*, 42 F.3d 809, the Third Circuit Court of Appeals upheld the district court's dismissal as a matter of law of Mr. and Mrs. Barna's § 1983 assault-based claim against the defendant officers "because the evidence could not support a finding that the officers were acting under color of state law," *id.* at 812. One evening, the Barnas, upset at the owner of a Christmas tree business, stopped by his lot with the intention of confronting him.

Coincidentally, Officer Otterbine, a relative of the Barnas, was sitting in his partner's truck outside a bar across the street from the Christmas tree lot and, discovering the Barnas' intentions, asked his partner, Officer Echevarria, to follow the Barnas home. Both officers, though carrying their service revolvers and police-issue nightsticks, were off-duty. After all the parties arrived at the Barnas' home, an altercation began. Officer Otterbine, witnessing the events, accused Mr. Barna of hitting Officer Otterbine's sister, at which point Mr. Barna told Officers Otterbine and Echevarria, "Look, you guys are out of your jurisdiction. Just get out of here, go home, this is none of your concern." Officer Echevarria retorted, "Jurisdiction? I'll show you jurisdiction," and the two officers attacked and beat Mr. Barna. At one point, Officer Otterbine put Mr. Barna in a chokehold with his nightstick. *Id.* at 813.

Then, returning to their truck, the officers "attempted to leave the scene," but "Mr. Barna, fearing for his wife's safety, retrieved an unloaded revolver from the house" and pointed it at the officers until his wife told him to stand down. Once the gun was no longer pointed at them, the officers alighted from the truck and drew on Mr. Barna, who fell backwards and flung his own gun into a hedge before running into his house and returning with a shotgun, telling the officers not to leave, and then retreating again into his home. The officers called for backup, and the on-duty officers who arrived at the scene arrested Mrs. Barna and, after an escalating and protracted hostage negotiation, convinced Mr. Barna to surrender voluntarily. Mr. and Mrs. Barna subsequently sued Officers Otterbine and Echevarria for violation of their civil rights under § 1983. *Id.* at 814.

The Third Circuit Court of Appeals began by dividing the events into discrete episodes for purposes of analysis. From the officers' following the Barnas home through the scuffle involving the nightstick, the issue raised by the Barnas' § 1983 assault-based claim was whether

the officers had acted under color of law. Once Mr. Barna drew a gun on the officers, the Court explained, it was clear that they were so acting. The issue, then, was whether the officers had acted constitutionally in drawing on and arresting the Barnas. *See id.* at 812; *see also id.* at 815-19 (color of law issue); *id.* at 819-21 (unconstitutional arrest and false imprisonment claims). But the fact that a police officer purports to act with official authority in one moment is not necessarily sufficient for a determination that he did so in the next. *See id.* at 817-18 ("[T]he fact that [the officers] attempted to leave after the assault establishes that the officers were not trying to arrest Mr. Barna *at the time they assaulted him.*" (emphasis added)); *id.* at 819 ("[T]he physical altercation between Mr. Barna and Officers Otterbine and Echevarria *had already concluded* when Mr. Barna returned from his house with a revolver and pointed it into the cab of the truck in which the officers sat. . . ." (emphasis added)); *see also, e.g.*, *Parrilla-Burgos v. Hernández-Rivera*, 108 F.3d 445, 450-51 (1st Cir. 1997) ("From the time that the two left the bar until Hernández shot Galletti, Hernández made no further pretense that he was acting as a police officer. . . . Because Hernández made no further pretense of official action, there is not enough evidence in the record, even taken in the light most favorable to the plaintiffs, to support the inference that Hernández was acting under color of state law when he shot Galletti."); *Martinez*, 54 F.3d at 986 ("The key determinant is whether the actor, *at the time in question*, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law." (emphasis added)); *Gueits-Colón*, 177 F. Supp. 2d at 136-37 ("The fact that an officer may have been acting under color of state law at one point in time does not mean that all action taken immediately thereafter will constitute action done under color of state law."); *Gonzalez v. Toledo*, No. 08-1869, 2009 WL 1767561, at *4 (D.P.R. June 16, 2009) ("The fact that an officer may

have been acting under color of state law at one point does not mean that all action taken immediately thereafter will constitute action done under color of state law.").

With regard to the initial assault-based claim, the Third Circuit Court of Appeals began by describing the general principles from Supreme Court precedent, as outlined above. It distinguished between action outside the scope of an officer's actual authority, but which nonetheless is under color of law because it is under pretense of law—that is, because the officer "purports to act according to official power," *Barna*, 42 F.3d at 816—from "purely private acts which are not furthered by any actual or purported state authority"—"not acts under color of state law," *id.* Resisting a rigid analysis in favor of thin slicing between the events, capacities, and statuses at issue, the *Barna* Court cited with approval, *id.* at 816-17, the decision of the Fifth Circuit in *Delcambre v. Delcambre*, 635 F.2d 407 (5th Cir. Unit A Jan. 1981) (per curiam), in which the court held that an alleged assault by an *on-duty* police chief on his sister, *at the police station*, did not occur under color of state law because the altercation arose out of the chief's personal (family and political) dispute with his sister, and she "was neither arrested nor threatened with arrest," *Delcambre*, 635 F.2d at 408. The *Barna* Court further explained that "[w]hile a police-officer's use of a state-issue weapon in the pursuit of private activities will have 'furthered' the § 1983 violation in a literal sense, courts generally require additional indicia of state authority to conclude that the officer acted under color of state law." *Barna*, 42 F.3d at 817 (citing *Bonsignore v. City of New York*, 683 F.2d 635, 637 (2d Cir. 1982)). This requirement of "additional indicia" makes sense. The question is not whether an officer happened coincidentally to use tools at his fingertips because he was a police officer, but whether he purported to exercise state authority in his actions.

Indeed, the *Barna* Court reasoned, "the evidence indicates that the underlying nature of their dispute was personal." *Id.* Not only were Officers Otterbine and Echevarria off-duty at the time of the altercation—a factor that "is not dispositive"—"there was no evidence to indicate that the officers were on official police business." *Id.* Not only were they outside of their official jurisdiction, but they also "had not been called to the scene to conduct official police business, nor were they in pursuit of Mr. Barna on the belief that he had already committed a crime." *Id.* They were not trying to arrest Mr. Barna, as their attempt to leave after the alleged assault demonstrated, *id.* at 817-18, and they "did not identify themselves as police officers . . . or otherwise invoke their police authority," *id.* at 818. In these ways, the case before the *Barna* Court was "unlike that in *Black v. Stephens*, 662 F.2d 181 (3d Cir. 1981)," in which the court had "concluded that an on-duty police officer may act under color of state law when he performs official duties that arose in a quasi-personal context." *Barna*, 42 F.3d at 818. In *Black*, the police officer had arrested the plaintiff in connection with a traffic accident between the plaintiff's and officer's vehicles, and the officer "was an on-duty (although plain-clothed) detective, he wore a police academy windbreaker, and he had initiated contact with the plaintiff on the belief that the plaintiff's actions warranted official investigation." *Id.* (citing *Black*, 662 F.2d at 188). In *Barna*, by contrast, "there was no evidence that the alleged assault occurred as a result of official police concerns; on the contrary, the evidence indicates that the assault arose out of the officer's familial and personal concerns." *Id.*

Still, the *Barna* Court did not simply cast aside the "arguable connections between the officers' alleged assault of Mr. Barna and the use of police authority." *Id.* These connections were

(1) Echevarria's comment, "I'll show you jurisdiction," made in response to Mr. Barna's statement that the officers were out of their jurisdiction, and (2) evidence

that Echevarria used a state-issue "PR-24" nightstick to hold Mr. Barna during the
assault—a weapon that Officer Echevarria could only legally carry in New Jersey
because of his position as a police officer.

*Id.* With respect to the jurisdiction comment, however, the *Barna* Court reasoned that the

comment was "too ambiguous to be of significant value on the issue of state authority" and

observed that "the officers were in fact out of their police jurisdiction." *Id.*; *cf. Parrilla-Burgos*,

108 F.3d at 450-51 ("[A]ny possibility that Galletti was intimidated by Hernández' claims of

official status is belied by the undisputed fact that Galletti invited Hernández to engage in a

private brawl. . . . The fact that Galletti not only initiated the confrontation, but subsequently

invited Hernández to 'fight it out' outside the bar shows that he was not so intimidated by

Hernández' status as a policeman as to cause him to refrain from exercising his legal rights."

(citation and internal quotation marks omitted)).

Further, the *Barna* Court opined that the officers' "use of a police-issue nightstick is

undoubtedly the Barna's strongest support for the view that the officers were acting under color

of state law." *Barna*, 42 F.3d at 818. Still, even this factor was "simply not enough to color this

clearly personal family dispute with the imprimatur of state authority." *Id.* That county policy

made police officers just that 24 hours a day was "insufficient indicia of state authority under the

circumstances" because, while the policy might have authorized an arrest by an off-duty officer,

the officers were not "engaging in activities normally associated with the police function." *Id.* at

818-19 n.11. The *Barna* Court's reasoning laid the groundwork for the Third Circuit Court of

Appeals' later statement in *Harvey v. Plains Township Police Department*, 635 F.3d 606, that

"the facts and circumstances of the police officer's role . . . must be examined in their totality,"

rather than with regard to "a single factual question," *id.* at 610-11:

To hold otherwise would create a federal cause of action out of any unauthorized
use of a police-issue weapon, without regard to whether there are any additional
circumstances to indicate that the officer was exercising actual or purported police

authority. We do not understand the under color requirement of § 1983 to be satisfied by such a tenuous connection to state authority. *See Bonsignore v. City of New York*, 683 F.2d 635 (2d Cir. 1982) (holding that officer who used police handgun to shoot his wife and then commit suicide did not act under color of state law even though he was required to carry the police gun at all times); *cf. Rivera v. La Porte*, 896 F.2d 691 (2d Cir. 1990) (finding assault occurred under color of state law when officer used service revolver to beat plaintiff and then arrested plaintiff for events giving rise to the assault).

*Barna*, 42 F.3d at 819. The *Barna* Court therefore affirmed the district court's judgment as a matter of law in favor of Officers Otterbine and Echevarria on the § 1983 assault-based claim "because a jury could not reasonably find that the assault occurred under color of state law." *Id.*

Several years later, in *Bonenberger v. Plymouth Township*, 132 F.3d 20, the Third Circuit Court of Appeals considered a sexual harassment suit brought under both Title VII and § 1983. *Id.* at 22. Ms. Bonenberger, a police dispatcher, alleged that the defendant, Officer La Penta, regularly made unwelcome sexual advances and obscene remarks to her at work and engaged in wrongful physical contact with her. *Id.* Though Officer La Penta was not Ms. Bonenberger's official supervisor, the role of supervising all dispatchers fell to him when no higher-ranking officer was present. *Id.* Reasoning that an officer such as La Penta, "may, under certain circumstances, wield considerable control over a subordinate whose work he regularly supervises, even if he does not hire, fire, or issue regular evaluations of her work," the *Bonenberger* Court reversed the district court's holding that Officer La Penta's harassment was not under color of law, *id.* at 23, because, it reasoned, "La Penta could alter [Ms. Bonenberger's] workload whenever he supervised her shift," and that if she "failed to follow his orders, the police department would view that failure as insubordination for which La Penta properly could begin a disciplinary process that might result in her discharge." *Id.* at 24. "Under these circumstances," the Court of Appeals explained, "La Penta's role within the departmental structure afforded him sufficient authority over Bonenberger to satisfy the color of law requirement of section 1983." *Id.*

*Compare Bonenberger*, 132 F.3d 20, *and Chisler v. Johnston*, No. 09-1282, 2010 WL 1257458, at *6 (W.D. Pa. Mar. 29, 2010) ("Using his authority as training officer, Johnston ordered Plaintiff into the 'bubble' and asked him to remove his equipment, including his PAT and keys. . . . [T]he Training Defendants handcuffed his hands behind his back, hit him on his right side, shoved him to the ground and used an electrical extension cord to hog-tie him. . . ."), *with Rogers v. City of Little Rock*, 152 F.3d 790, 798 (8th Cir. 1998) (holding that an officer had acted under color of law where he coerced a woman to have sex with him by relying "on his authority as a police officer to facilitate the assault" because "[h]e stopped [her] for a broken tail light, raised the prospect of towing her car when she did not have the insurance papers, and later after going to her home said that she owed him a favor in exchange for letting her go"), *and Smith v. Cochran*, 216 F. Supp. 2d 1286, 1294-95 (N.D. Okla. 2001) (holding that plaintiff prison inmate had satisfied § 1983's under color of law requirement where the defendant guard "still used his authority, with the required nexus to the state to carry out his plan of coercive sexual rendezvous and violated [plaintiff's] civil rights" because "[w]ithout his cloak of state authority, [defendant] could not have performed the alleged sexual assaults" (citation and internal quotation marks omitted)), *aff'd*, 339 F.3d 1205 (10th Cir. 2003).

So apparent was this supervisory dynamic to the *Bonenberger* Court that it laid down an unequivocal and arguably categorical rule: "If a state entity places an official in the position of supervising a lesser-ranking employee and empowers him or her to give orders which the subordinate may not disobey without fear of formal reprisal, that official wields sufficient authority to satisfy the color of law requirement of 42 U.S.C. § 1983." 132 F.3d at 24-25. But the Court of Appeals left no doubt that its rule for supervisor-supervisee relations did not "suggest that all acts of an on-duty state employee are state action for purposes of section 1983." *Id.* at 24.

The rule that "a state employee who pursues purely private motives and whose interaction with the victim is unconnected with his execution of official duties does not act under color of state law," in the particular context of employee-on-employee altercations, requires "that the alleged offender, in committing the act complained of, abused a power or position granted by the state." *Id.*

Of course, neither the *Bonenberger* Court nor any other, to this Court's knowledge, has purported to lay down the opposite categorical rule, viz., that § 1983 liability will not stand between coworkers (say, police officers) of equal rank; there is no "general rule of section 1983 non-liability for co-employee harassment." *Anthony v. County of Sacramento*, 845 F. Supp. 1396, 1401 (E.D. Cal. 1994). But the circumstances for coworker liability are necessarily narrow. *Cf. Rouse v. City of Milwaukee*, 921 F. Supp. 583, 588 (E.D. Wis. 1996) ("[C]ourts have generally declined to find liability under § 1983 against a co-worker unless the harassment involved an abuse of authority or position."). In *Anthony v. County of Sacramento*, for instance, a black female deputy sheriff could state a claim under § 1983, and properly under color of law, against other deputies who, she alleged, retaliated against her for her defense of black inmate rights, "whether or not the individual defendants acted in a supervisory capacity vis-a-vis the plaintiff," because "[t]he individual deputies were all under a state-conferred duty to protect inmate rights and respond appropriately to related complaints. They were in a unique position as deputies, not just as co-workers, to retaliate for such complaints." 845 F. Supp. at 1401 n.5; *see id.* at 1401. As the *Anthony* Court observed,

> The complaint depicts a work environment made racially and sexually hostile by related attacks on plaintiff individually on the abilities of African-American law enforcement personnel generally, and on inmates of color. The consistent theme linking these forms of abuse is that of African-American inferiority and criminality, in the context of law enforcement effectiveness.

*Id.* at 1401-02 (footnotes omitted). In *Rouse v. City of Milwaukee*, the Court had no trouble

distinguishing *Anthony* as a case in which "the deputy sheriffs abused their position and

responsibility," and therefore acted under the color of law, whereas in *Rouse* "there [was] no

such unique relationship between Officer Lane's duties or responsibilities and his alleged

harassment of plaintiffs." 921 F. Supp. at 588-89. The *Rouse* Court's distinction is a crucial one:

"While the nature of [the officer's] employment may have placed him in the paths of the

plaintiffs, there was nothing specific or unique about his assigned duties . . . that brought him

into contact with the plaintiffs" with respect to his conduct towards them. *Id.* at 589.

     Under *Barna* and *Bonenberger*, the two main cases upon which Ms. Washington-Pope

seeks to rely, much of the work of explicating the "under color of law" analysis regarding police

officers belongs to the district courts. Although "[t]he concepts of acting 'under color of state

law' and acting 'within the scope of employment' while comparable are not the same,"

*Hickenbottom v. Nassan*, No. 03-223, 2007 WL 7753803, at *43 (W.D. Pa. Mar. 29, 2007), a

number of courts have explained that "[t]o determine if an officer was depending upon the 'cloak

of the state's authority' to commit the alleged acts, courts ask whether the officer's actions are

consistent with actions generally taken by a police officer," *Jackson-Gilmore*, 2005 WL 3110991,

at *10 (citing *Griffin*, 387 U.S. at 135; *Barna*, 42 F.3d at 816); *accord Pryer*, 2004 WL 603377,

at *4 ("To determine if an officer was acting in his or her official capacity, courts ask whether

the nature of the actions performed by the officer is consistent with actions taken by a police

officer."); *Halwani v. Galli*, No. 99-1450, 2000 WL 968219, at *2 (E.D. Pa. July 13, 2000)

("Essentially, the rule has become one in which an off-duty police officer is found to be a state

actor when and if the action under review is consistent with the actions taken by a police

officer."); *see Thomas v. Kip*, No. 08-075, 2013 WL 4453753, at *5 (D.V.I. Aug. 16, 2013)

("According to his sworn deposition testimony regarding the events immediately preceding the shooting, Defendant Roberson drew his firearm, identified himself as a member of the Department of Justice, stated that he was armed, and demanded that Thomas stop. Such invocation of authority is consistent with law enforcement practice."); *cf. Showalter v. Brubaker*, 283 F. App'x 33, 35 (3d Cir. 2008) ("Although Brubaker and Ebersole are state officials, the Complaint provides no facts from which we could reasonably infer that they invoked their state authority or otherwise attempted to exercise the power vested in them by state law. To the contrary, it asserts the pair acted outside the scope of their state employment . . . .").[2]

Further, while courts in this Circuit do "not suggest[] that the mere fact that [a police officer's] conduct was motivated by personal revenge compels a finding that he was not acting under color of state law, *Galliano v. Borough of Seaside Heights*, No. 03-1463, 2007 WL 979850, at *9 n.10 (D.N.J. Mar. 30, 2007),[3] they have been careful to require plaintiffs to show that officers acting for private motives did in fact purport to use state authority. *See, e.g.*, *Rankin v. Smithburger*, No. 12-01373, 2013 WL 3550894, at *7 (W.D. Pa. July 11, 2013) (denying Officer Smithburger's motion to dismiss because while he may have acted "as Mrs. Smithburger's husband when he entered Ms. Rankin's home, destroyed her property, and evicted her," he was

---

[2] As the *Barna* Court explained, a relevant question is whether the officers were "engaging in activities normally associated with the police function." 42 F.3d at 818-19 n.11. In considering whether an officer's conduct was consistent with general police activities, these courts have also placed significant weight on whether the defendant officer attempted to arrest the plaintiff. *See, e.g.*, *Stroby v. Egg Harbor Township*, 754 F. Supp. 2d 716, 720 (D.N.J. 2010) ("Defendant did not threaten Plaintiff with arrest, did not use any of his police-issued weapons, and did not attempt to invoke legal authority with Plaintiff."); *Pryer*, 2004 WL 603377, at *5; *Halwani*, 2000 WL 968219, at *3 ("This case is not unlike that of *Delcambre*, in that, Galli did not threaten to arrest Halwani.").

[3] The *Barna* Court had already explained that "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity." 42 F.3d at 816.

also "acting under the pretense of his authority as a constable of Fayette County. . . . It does not matter that Mr. Smithburger may have been motivated by a desire to help his wife if he abused his state authority in so doing"); *Galliano*, 2007 WL 979850, at *7-9 & n.10; *Heverly v. Simcox*, No. 05-1370, 2006 WL 2927262, at *5 (M.D. Pa. Oct. 11, 2006) (holding that "[w]hile Plaintiff Simcox and Defendant Simcox may have 'bad blood' towards each other, Defendant Simcox clearly demonstrated that his conduct on December 5, 2003 was under the authority of his position as a Pennsylvania deputy game commissioner" when Defendant Simcox "specifically showed Plaintiff Simcox his badge, which identifies his position with the Pennsylvania Game Commission, and alerted Plaintiff Simcox that he was in alleged violation of hunting regulations"). As the *Jackson-Gilmore v. Dixon* Court put it, there are really two requirements: "In addition to possessing or purporting to act with state authority, this authority must enable the officer to do what he did." 2005 WL 3110991, at *10; *see id.* at *9 (same) (citing *Barna*, 42 F.3d at 815-16).[4]

> 2. ***Martinez v. Colon*, the First Circuit Court of Appeals' Decision Regarding Police-on-Police Altercations, its Progeny, and Their Consistency with the Principles and Reasoning in the Third Circuit and Others**

The Third Circuit Court of Appeals has not yet addressed the question closest to the one in this case: How does a court conduct the specific analysis of whether violence *between two*

---

[4] This observation makes these cases in the Third Circuit consistent with the Ninth Circuit Court of Appeals' rule that

> there are three critical requirements that must be satisfied. First, the defendant's action must have been performed while the officer is acting, purporting, or pretending to act in the performance of his or her official duties. Second, the officer's pretense of acting in the performance of his duties must have had the purpose and effect of influencing the behavior of others. Third, the challenged conduct must be related in some meaningful way either to the officer's governmental status or to the performance of his duties.

*Anderson*, 451 F.3d at 1068-69 (citations and internal quotation marks omitted).

*police officers* working together is private or under color of law? The stage was set for the answer to this question to be played out in in *Martinez v. Colon*, 54 F.3d 980, in which the First Circuit Court of Appeals looked approvingly upon the Third Circuit Court of Appeals' decision in *Barna*, *see Martinez*, 54 F.3d at 986-88 (thrice citing *Barna*, 42 F.3d at 816-19), and approached the question "consistent with the approach taken by other circuits that have considered the issue of whether the actions of police officers are taken under color of state law," *Parrilla-Burgos*, 108 F.3d at 450 (referring to *Martinez*, 54 F.3d 980, and citing *Barna*, 42 F.3d at 818-19). *Martinez*, then, is instructive here.

In *Martinez*, the First Circuit Court of Appeals affirmed the district court's entry of summary judgment in favor of the defendants because, it agreed, they had not acted under color of law. The events giving rise to the lawsuit began when Officer Martinez arrived early for his 4:00 AM shift at his police station and was approached by Officer Valentin, who, calling Martinez "pretty boy," "drew his service revolver, pointed it at Martinez' stomach, cocked the hammer, placed his finger on the trigger, and inquired if Martinez was afraid." 54 F.3d at 982. A short time later, Officer Valentin accosted Officer Martinez in the station and ripped a hole in Officer Martinez's shirt before walking away.

> Soon thereafter, Valentin reappeared, pointed his revolver at Martinez' genitals, cocked the hammer, and, with his finger on the trigger, threatened to "blow away" Martinez' penis (asking him, somewhat rhetorically, if he was scared). When Valentin lowered the weapon, Martinez immediately moved away from him. Within minutes Valentin again approached Martinez, cocked the revolver, aimed it at Martinez' groin, and resumed his taunting. The revolver accidentally discharged, maiming Martinez.

*Id.*

The *Martinez* Court began its "under color of law" analysis, consistent with *Barna*, by observing that determining whether an officer acted under color of state law "rarely depends on any single, easily determinable fact, such as a policeman's garb" and that misuse of or action in

excess of authority is action under color of law. *Id.* at 986. "[C]ourts must beware simplistic solutions . . . . The point is that segregating private action from state action calls for a more sophisticated analysis." *Id.* Rather than relying on a wooden application of factors, the inquiry "turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Id.* It is not enough that the officer's position is a but-for enabler of his action.[5] Rather, "the actor, at the time in question," must "purpose[] to act in an official capacity or to exercise official responsibilities pursuant to state law," *id.*, and so the court must examine "additional indicia of state authority to conclude that the officer acted under color of state law" rather than in "in pursuit of private activities," *id.* at 988 (citing *Barna*, 42 F.3d at 817-18). Without "some meaningful" relationship to the officer's status or duties, his conduct cannot be under "pretense" of law, and therefore cannot be under color of law. *Id.* at 986-87. To assess whether Officer Valentin's action constituted "purely personal pursuits or, conversely, whether he was acting under color of state law," required the *Martinez* Court to "assess the nature of his conduct in light of the totality of the circumstances."

---

[5] *Martinez* contained the language that "[i]n general, section 1983 is not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, *or unless the conduct is such that the actor could not have behaved in that way but for the authority of his office*." 54 F.3d at 986 (emphasis added). In *Parrilla-Burgos v. Hernández-Rivera*, the plaintiffs, citing this language from *Martinez*, argued that Officer "Hernández acted under color of state law because but for his official authority, he could never have done what he did." 108 F.3d at 449. The First Circuit Court of Appeals rejected such an "expansive" reading, and noted that it had "rejected such a sweeping standard for § 1983 liability" in *Martinez* itself, in favor of the totality of the circumstances standard discussed above. *Id.*

In fact, this rejected argument is also the position of the dissent in *Martinez*: "I think that Valentin exercised power possessed by virtue of Puerto Rico law and made possible only because he was clothed with the authority of Puerto Rico, and that he abused that power." *Martinez*, 54 F.3d at 992 (Bownes, J., dissenting). And it is one that the Third Circuit Court of Appeals has also implicitly rejected. *See Barna*, 42 F.3d at 818 & n.11 ("In short, we believe the unauthorized use of a police-issue nightstick is simply not enough to color this clearly personal family dispute with the imprimatur of state authority.").

Of course, the devil is in the details. The *Martinez* Court concluded that rather than exercising or purporting to exercise any "real or pretended" power under state law, Officer "Valentin was bent on a singularly personal frolic: tormenting an acquaintance." *Id.* at 987. "Hazing of this sort, though reprehensible" the Court of Appeals concluded, "is not action under color or pretense of law." *Id.* True, Officer Martinez was on duty and in uniform, the events transpired at the police station, and Valentin shot Martinez with his service revolver. But viewed, as they must be, in context, these facts still did not indicate that "Valentin's actions were in any meaningful way related either to his official status or to the performance of his police duties." *Id.* (analogizing to *Delcambre*, 635 F.2d at 408). Without "additional indicia of state authority," *id.* at 988 (quoting *Barna*, 42 F.3d at 817-18), the Court of Appeals considered "the unauthorized use of a government-issue weapon . . . too attenuated a link to hold together a section 1983 claim," *id.*; *see also Barna*, 42 F.3d at 818 & n.11 ("[T]he unauthorized use of a police-issue nightstick is simply not enough to color this clearly personal family dispute with the imprimatur of state authority.").

Martinez is especially important for cases like Ms. Washington-Pope's because it serves as a reminder that the factors for determining whether a defendant has acted under color of law cannot be addressed out of context or without a constant eye toward whether they in fact help to answer the question of whether the defendant was acting under *pretense* of law. The strength of the *Martinez* Court's reasoning is evident in decisions by courts both inside and outside the First Circuit citing it for the proposition that a police officer's conduct must be meaningfully related to his official duties or that the officer must have purported to use his authority to deprive the victim of his or her constitutional rights. *See, e.g.*, *Anderson*, 451 F.3d at 1069 (9th Cir.) (citing *Martinez*, 54 F.3d at 987, and finding that defendant officer had acted under color of law where

he had invoked his status as a police officer to prevent bystanders from interfering with his assault on plaintiff who accidentally rear-ended the officer's vehicle).

Most decisions are of less utility than *Martinez* when it comes to the narrower, more specific question of how to analyze whether the under color of law requirement is met in cases involving altercations between two police officers. Prior to *Martinez*, the few such decisions seem to be restricted to cases involving sexual harassment between employees. *See, e.g.*, *Rouse*, 921 F. Supp. 583. For what seems to be the first time—perhaps because of the rarity of such cases—*Martinez* confronted the issue of the uniqueness of the police-on-police inquiry, albeit in a footnote:

> Had Martinez been a civilian rather than a fellow officer, the significance of Valentin's uniform and weapon for purposes of the color-of-law determination might well have been greater. *See, e.g.*, *Jones v. Gutschenritter*, 909 F.2d 1208, 1212-13 (8th Cir. 1990) (observing that the presence of a uniformed and armed police officer may reasonably cause a civilian to refrain from taking action to protect his rights). But when the victim is himself a fellow officer and the particular interaction between the two officers is of a distinctively personal nature, it can generally be assumed that the aggressor's official trappings, without more, will not lead the victim to believe that the aggressor is acting with the imprimatur of the state and, in turn, to forgo exercising his legal rights. The facts in this case are congruent with this hypothesis. The campaign of terror that Valentin mounted was patently personal in nature, and Martinez unquestionably realized as much; indeed, there was not the slightest indication that Valentin's conduct was undertaken pursuant to the authority of his office. Plainly, the fact that Martinez walked away numerous times shows that he was not "so intimidated" by Valentin's status as a policeman "as to cause him to refrain from exercising his legal right[s]." *Id.* at 1212.

*Martinez*, 54 F.3d at 988 n.6 (alteration in original).

Though in a footnote, and one heavily criticized by the *Martinez* panel's dissenter, *see id.* at 992-93 (Bownes, J., dissenting), the *Martinez* majority's reasoning is persuasive: in essence, the contention is that the fact that the victim is also a police officer may lessen the likelihood that she believes (and the perpetrator's belief that) the perpetrator is purporting to act pursuant to

official authority, the contours of which are likely quite familiar to the victim.[6] The First Circuit reaffirmed the reasoning behind this position by citing the footnote two years later in *Parrilla-Burgos v. Hernández-Rivera*, 108 F.3d 445, in which it held that a police officer who had shot dead the victim after the two moved outside during an altercation that began inside a bar, had not acted under color of law even though the officer had both escalated the altercation by telling the victim, "I look at anybody I want, because I'm a cop. Anybody I decide I want to look at dirty, I look at them dirty," and identified himself to the gathering crowd inside the bar as a police officer. *Id.* at 447. Citing the footnote from *Martinez*, the Court of Appeals explained that "[t]he fact that [the plaintiffs' decedent] not only initiated the confrontation, but subsequently invited [the officer] to 'fight it out' outside the bar shows that he was not so intimidated by [the officer's] status as a policeman as to cause him to refrain from exercising his legal rights." *Id.* at 451 (citation and internal quotation marks omitted).

### 3.     Subsequent Case Law on Police-on-Police Altercations

Still, since *Martinez*, as before it, there appear to be few cases dealing with police-on-police violence. In *Segreto v. Kirschner*, 977 F. Supp. 553 (D. Conn. 1997), the court considered Officer Segreto's claims that defendant officers had harassed him out of the belief that he was a homosexual by, inter alia, hanging him upside down and attempting to stuff his head in a urinal and, later, hitting him with a caning stick. *Id.* at 559. The *Segreto* Court held that while "[t]he conduct complained of, if it occurred, certainly is reprehensible," *id.* at 557, "the defendants were not acting under color of state law as required for liability under § 1983," *id.* at 562. Central to the Court's finding was its observation that the fact that the defendants might have been "in a position to engage in abusive or offensive conduct toward plaintiff because their jobs enabled

---

[6] In this respect, *Martinez* is easy to square with *Bonenberger* and other § 1983 harassment cases addressing whether the perpetrator's harassment was furthered by any supervisory authority he may have possessed.

them to have frequent encounters with him at their place of employment" did not mean that they took their action under color of law. *Id.* at 562. Rather, the conduct must be "related to the duties and powers inherent in [the defendants'] jobs." *Id.* Looking to *Martinez*, the *Segreto* Court agreed that "if plaintiff had 'been a civilian rather than a fellow officer, the significance of [defendant officer's] uniform and weapon for purposes of the color-of-law determination might well have been greater.'" *Id.* at 563 (quoting *Martinez*, 54 F.3d at 988 n.6). But the defendants' behavior was not meaningfully related to their official status or duties, and, as the *Martinez* Court had reasoned, where the plaintiff was a fellow officer, the defendants' official status could not be assumed to lead the plaintiff to believe that they had acted "with the imprimatur of the state." *Id.* (quoting *Martinez*, 54 F.3d at 988 n.6).

*Bailey v. Prince George's County*, 34 F. Supp. 2d 1025 (D. Md. 1999), is also consistent with *Martinez* and *Barna*, although the *Bailey* Court cited neither case. Ms. Bailey, an administrative assistant to a police commander—i.e., a civilian police employee—sued Lieutenant Brock under § 1983 for "purportedly block[ing] the exit and for a brief moment prevent[ing] Bailey from leaving" a room after the two exchanged heated words. *Id.* at 1025-26. Analogizing to *Delcambre v. Delcambre*, 634 F.2d at 408, the *Bailey* Court held that Lieutenant Brock had not acted under color of law because "[t]he only reasonable conclusion . . . is that Brock was . . . engaged in a personal interaction. She was not performing a police function nor could she reasonably be believed to be. Instead, she was engaged in an office quarrel with a co-worker she thought had treated her rudely." *Id.* at 1027-28. Though Lieutenant Brock had probably not infringed on any constitutional right in any case, the *Bailey* Court thought that the antecedent "under color of law" requirement was unsatisfied. *See id.*

Similarly, in a short opinion in *McNeese v. Vandercook*, 173 F.3d 429, at *1-2 (6th Cir. 1999) (per curiam) (table opinion), the Sixth Circuit Court of Appeals, citing to *Barna* but not *Martinez*, held that where Deputy Sheriff Don Badacour hit fellow Deputy Sheriff Bryan McNeese in the face when McNeese continued to talk after Badacour told him to "shut up," Badacour had not acted under color of law. The *McNeese* Court reasoned that "Badacour did not use his official identification to intimidate McNeese, did not use any officially-issued equipment to hurt McNeese, and did not purport to act within the ambit of his official duties. Badacour hit McNeese for a personal reason and did not rely on his authority as a deputy." *Id.* at *2.

Finally, the most recent case to deal with police-on-police altercations, *Molera v. City of Nogales*, No. 11-00097, 2013 WL 4804292 (D. Ariz. Sept. 9, 2013), addressed Officer Molera's "claims that Sergeant Bon pointed [a] Taser at Officer Molera's genitals" and "intentionally turned the Taser on and off, shocking Officer Molera on the penis." *Id.* at *1. Applying the three requirements from *Anderson v. Warner*, 451 F.3d at 1068-69,[7] the *Molera* Court held that Officer Bon was not acting under color of state law because

> [n]o reasonable juror could infer that Sergeant Bon was pretending to act in his official capacity when he tased Officer Molera. The undisputed facts demonstrate that Officer Molera and Sergeant Bon historically threatened to tase each other and at the time of the tasing Officer Molera was posturing and/or standing over Sergeant Bon daring him to turn the Taser on. "Just because [defendant] is a police officer does not mean that everything he does is state action." *Gritchen v. Collier*, 254 F.3d 807, 813 (9th Cir. 2001). Tasing a subordinate officer is undisputedly outside the scope of Sergeant Bon's official duties. *See id.* (finding that officer who threatened to sue a private citizen during a traffic stop was not acting under color of state law given that such conduct was not subject to the control of the police department and was quintessentially personal). This case is factually similar to *Martinez v. Colon*, 54 F.3d 980, 987 & n.5 (1st Cir. 1995), *cited in Anderson v. Warner*, 451 F.3d 1063, 1068 (9th Cir. 2006), in which one officer accidentally shot another officer in the groin while "horsing around." The *Martinez* court concluded: "though on duty and in uniform, [the assailant's] status as a police officer simply did not enter into his benighted harassment of his fellow

---

[7] *See supra* note 4.

officer. Hazing of this sort, though reprehensible, is not action under color or pretense of law." That reasoning applies with equally persuasive force in this case.

*Molera*, 2013 WL 4804292, at *5 (footnote omitted).[8]

### 4. An "Under Color of Law" Inquiry Calibrated Specifically for Police-on-Police Violence

Canvassing the "under color of law" case law for clashes involving police officers has revealed a chiaroscuro picture,[9] with much light cast upon the actions of officers toward civilian victims and considerably less upon altercations between colleagues. But close observation of both sets of cases allows the contours of the essential features to emerge.

The inquiry, like any other, must consider the totality of the circumstances in a fact-intensive analysis. *See Harvey*, 635 F.3d at 610-11; *Parrilla-Burgos*, 108 F.3d at 449-50 (citing *Barna* and authority from other circuits and explaining that "[w]hile not explicitly adopting a totality of the circumstances test, these courts have examined the circumstances surrounding a challenged act to determine whether it was committed under color of state law"). The ultimate question is whether the perpetrating officer's conduct is "related in some meaningful way either to the officer's governmental status or to the performance of his duties," *Martinez*, 54 F.3d at 987, or whether the officer's conduct consists of "purely private acts which are not furthered by any actual or purported state authority," *Barna*, 42 F.3d at 816.

---

[8] Two other cases since *Martinez* have dealt with police-on-police altercations, but only coincidentally, since the plaintiffs and defendants were members of different police departments and came across each other's paths rather accidentally. However, the outcomes are consistent with the reasoning and principles of the cases discussed above. *See Gueits-Colón*, 177 F. Supp. 2d at 132; *Isaacs v. City of New York*, No. 10-4177, 2012 WL 314870, at *2-3 & n.2 (E.D.N.Y. Feb. 1, 2012).

[9] *See Gueits-Colón*, 177 F. Supp. 2d at 135 ("Ferdinand also argues that he was not acting under color of state law. Because he is a police officer, the analysis of this issue is significantly more complex than was required for Cruz. In making this analysis, the Court is guided by the recent series of First Circuit cases on this chiaroscuro area of the law.").

But the words "related to" alone may not be construed too broadly, and they certainly cannot be construed as simplistic but-for enablement of the perpetrator's conduct only in the sense that if the perpetrator and defendant were never co-officers they never would have encountered one another. *See, e.g.*, *Martinez*, 54 F.3d at 986; *Segreto*, 977 F. Supp. at 562; *supra* note 5. Rather, the perpetrator's action must "purpose[] to act in an official capacity or to exercise official responsibilities pursuant to state law," *Martinez*, 54 F.3d at 986, such that his actions were under the *pretense* of law—i.e., his outwardly affected or purposed to influence others' behavior, *see Anderson*, 451 F.3d at 1068-69. But because the victim is a fellow police officer, a number of indicia of state action, *see Barna*, 42 F.3d at 817-18, lack their usual luminosity. Duty status and official attire, not per se determinative in any case, are less telling; both defendant and plaintiff are likely to be wearing them and understand whatever significance they might or might not have. Similarly, the question is not whether the perpetrator used official equipment, such as a gun or nightstick, but how he used it. *See Barna*, 42 F.3d at 818 n.11. If the altercation seems to be "of a distinctively personal nature, it can generally be assumed that the aggressor's official trappings, without more, will not lead the victim to believe that the aggressor is acting with the imprimatur of the state and, in turn, to forgo exercising his legal rights." *Martinez*, 54 F.3d at 988 n.6. Thus, behavior by the victim that suggests she was not intimidated by the perpetrator's *official status*—as opposed to by his weapon—militates against finding that the perpetrator acted under color of law. *See Parrilla-Burgos*, 108 F.3d at 450-51; *see also Barna*, 42 F.3d at 818.[10]

---

[10] None of this is to say that a victim's subjective perceptions are the test for determining whether an officer acted under color of law, *see Strange*, 104 F.3d at *4 ("The under color of law determination does not turn on an individual's subjective understanding of an actor's conduct."), but, as the First Circuit reasoned in *Martinez*, the fact that victim and perpetrator are co-officers is an important factor in the totality of the circumstances analysis.

Moreover, the court must consider the conduct in the context of the particular moment in which it occurred. *See Barna*, 42 F.3d at 817-18; *supra* pp. *18-19. If the officer's actions are consistent with those usually taken by a police officer, they are more likely to be under color of law—and vice versa. *See, e.g.*, *Jackson-Gilmore*, 2005 WL 3110991, at *10; *Pryer*, 2004 WL 603377, at *4; *Halwani*, 2000 WL 968219, at *2; *Thomas*, 2013 WL 4453753, at *5 (D.V.I. Aug. 16, 2013). And if the perpetrator has supervisory authority over the victimized officer, and purports to abuse that "authority or position," *Rouse*, 921 F.2d at 58, then he likely "wields sufficient authority to satisfy the color of law requirement of 42 U.S.C. § 1983," *Bonenberger*, 132 F.3d at 24-25.

Taking all these factors into consideration, the court may conclude that the perpetrating officer's conduct was a private wrong not committed under color of law. *See, e.g.*, *Martinez*, 54 F.3d 980; *McNeese*, 173 F.3d 429; *Molera*, 2013 WL 4804292; *Bailey*, 34 F. Supp. 2d 1025; *Segreto*, 977 F. Supp. 553; *Rouse*, 921 F. Supp. 583. For § 1983 is not a font of constitutional protection—"It is well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state." *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1150 (3d Cir. 1995).

### 5.      Shedding Light on the Dark Events of September 24, 2010

Mr. Bailey argues that he did not act under color of law for purposes of § 1983 when he pointed his gun at Ms. Washington-Pope's head because "there is no evidence that [he] was taking any purported 'police action' for the alleged purpose of enforcing the law or 'abusing his power' as a police officer." Bailey Mem. at 5 (Docket No. 16). "[T]he pointing of the gun," he contends, "was precipitated by a verbal exchange completely unrelated to the performance of [his] duties as a police officer." *Id.* In the absence of any "evidence that any of Officer Bailey's actions that were directed at his partner were taken for the purpose of exercising his authority as

a police officer," he contends, he was not, as a matter of law, acting under color of law. *Id.* at 7. Although the required analysis is more nuanced than Mr. Bailey suggests, his essential contention is correct, as the foregoing extensive discussion should suggest. The Court agrees that he did not act under color of law during the incident giving rise to this lawsuit.

In response, however, Ms. Washington-Pope argues that "Defendant Bailey's motives were not purely private, and his interaction with his partner, Ms. Washington-Pope, was not unconnected with his execution of his official duties." Washington-Pope–Bailey Mem. at 21 (Docket No. 18). In fact, she points out, Officer Bailey "cannot recall having any motives, let alone private ones." *Id.* at 21 n.3. She suggests that Officer Bailey's reliance on *Barna v. City of Perth Amboy* is misplaced, and attempts to distinguish *Barna* by pointing out that

> Officer Bailey's actions did not stem from a family dispute and did not take place while he was off-duty, out of his jurisdiction, and after leaving a bar. Ms. Washington-Pope was not a member of Defendant Bailey's family, and was forced to partner-up with Defendant, Officer Bailey and share a patrol car with him while they were on-duty. They did so over a full shift and engaged in and exercised police powers the entire time.

*Id.* at 22 (citations omitted).

The problem is not Ms. Washington-Pope's recitation of the facts, but rather the legal significance with which she would vest them. The fact-intensive question here is whether, under the totality of the circumstances, Officer Bailey's conduct was related in some meaningful way to his status or the performance of his duties, such that it was not purely private. The implicit suggestion that but for being forced to "partner-up with . . . Officer Bailey and share a patrol car with him," the incident would not have occurred, is unavailing. The case law canvassed earlier has firmly established that it is an officer's purporting to exercise authority—some vestige, but not necessarily the whole cloth of which he possesses—that brings his conduct under color of law, not the unfortunate coincidence of their co-employment. Officer Bailey must have acted

under pretense of law; in other words, he must have purported to act under authority of law when he pointed the gun at Ms. Washington-Pope's head. Though his behavior is alarming and reprehensible, nothing suggests he pretended to act with any official police authority when he raised his service weapon.

For one, the question is not what Officer Bailey was doing five minutes or even ten seconds before the violence Ms. Washington-Pope complains of, even if in fact he was patrolling the streets or invoking his police authority to third parties. The question is the nature of the act Officer Bailey committed *towards his partner*, *at the moment in time he committed it*. Ms. Washington-Pope's argument that she had to be Officer Bailey's partner "over a full shift and engaged in exercis[ing] police powers the entire time" is unresponsive to this requirement. Second, especially in cases of violence between two officers, without more, the fact that the perpetrator was on duty and that he committed the violence complained of with a police-issue gun and on police property—here, in a patrol car—is insufficient to bring his conduct under color of law. These manifestations of police authority are not per se determinants; rather, they are potential indicators to help answer the question, even if circumstantially, actually at issue: whether the officer acted under pretense of law, such that the victim officer could have believed that he was acting with the imprimatur of the state—viz., whether the victim was intimidated by the perpetrating officer's official status.

If Officer Bailey had had supervisory authority over Officer Washington-Pope, or otherwise had greater authority than her, then her citation to *Bonenberger* might have been more persuasive. The positions of power that higher-ranking perpetrators have may, in many cases, give them the opportunity and pretended authority to intimidate their lower-ranking victims such that the perpetrators' actions satisfy § 1983's color of law requirement. That does not appear to

be the case here, and far from it. By Ms. Washington-Pope's account, she attempted to convince

him (and ultimately did) to drive back to headquarters so that she could involve superiors

because, far from purporting to act with authority, Officer Bailey was acting erratically and, as

she reflected during the incident, consistent with his tendency to take things too far or handle

them with a violent undertone.

As the foregoing survey of the case law has suggested, police officers have often been

found to act under color of law where they have either attempted to arrest (or arrested) the

plaintiff or where they have engaged in conduct otherwise consistent with actions generally

taken by police officers (albeit usually outside of constitutional limits). The events described—

Officer Washington-Pope's asking Officer Bailey whether he had taken his medication or sugar

pills and the escalating conversation until he pulled his gun—cannot be described as consistent

with normal or customary police behavior. Officer Washington-Pope's reaction—her considering

drawing on him herself—suggests that she was aware, as a reasonable partner would have been,

of the outrageous, off-the-rails, and unlawful nature of his conduct. This observation is not so

much an independent factor, but rather another way of asking the ultimate question, namely,

whether Officer Bailey purported to act with authority to further his acts.[11]

Nor is it of significance that "Officer Bailey's actions did not stem from a family dispute."

Again, the test is not whether the dispute between two officers was family-related; such a

showing is simply one way, albeit an unsurprisingly common one, to show that an officer's

conduct might be purely private. Family was at issue in both *Barna* and *Bonenberger*, but private

conduct can occur for a variety of other reasons, as *Martinez*, *Parrilla-Burgos*, *McNeese*, *Molera*,

*Bailey*, *Segreto*, *Rouse*, and other cases amply demonstrate. The test is not whether certain

---

[11] *See supra* note 10.

factors are met, but what those factors, in context, *mean*. The absence of a family dispute here, when the evidence establishes that Officer Bailey never purported to invoke his official authority, means little at all. Nor, for the same reason, is it dispositive that the harm to Ms. Washington-Pope did not occur through hazing, as in *Martinez*, *Molera*, or *Segreto*.

Ms. Washington-Pope has one final argument. She contends that Officer Bailey's actions "were directly connected to [his] execution of official duties," so they could not have been, in the words used by the *Barna* Court, "purely private."

> Before [his] seizure of Washington-Pope took place, . . . Officer Bailey stopped the car and looked under the vehicle, because he heard noises, which Washington-Pope did not hear. On the way to the third assignment, [he] thought a car was following their patrol car. Then [he] went past the street that they were supposed to go for the third assignment, and [he] started to ramble. [He] then asked why he was being criticized and Ms. Washington-Pope responded 'Because you're . . . tripping.' Then [he] said 'Say it again.' Immediately after [his] threat, Washington-Pope was seized as . . . Officer Bailey's police issued [G]lock was aimed at her temple. [His] work-related threat, that occurred on-duty, in their parked patrol car outside of their next assignment, was not premised on a family dispute and was not 'purely private.' Also, it is abundantly clear that . . . Officer Bailey placed his gun to Ms. Washington-Pope's head immediately after Ms. Washington-Pope's criticisms of his job performance, which is directly connected to Bailey's execution of his official duties. Finally, patrolling the streets, stopping at residences in need of assistance, and pursuing, stopping and searching the inebriated driver all show [that] Officer Bailey was acting pursuant to his official duties on the night of the incident and he did not suddenly lose the cloak of government action when he did what he claims he doesn't remember. [His] conduct during his seizure of Ms. Washington-Pope does not fit within the narrowly tailored exception best expressed in *Bonenberger*."

*Id.* at 22-23 (citation and footnote omitted).

First, that "Officer Bailey was acting pursuant to his official duties on the night of the incident" is, again, unresponsive to whether he was acting pursuant to his official duties (or, that is, purporting to do so) *when he allegedly assaulted Ms. Washington-Pope*. Ms. Washington-Pope asserts that he cannot "suddenly lose the cloak of government action" if he spent all night "patrolling the streets, stopping at residences in need of assistance, and pursuing, stopping and

searching [an] inebriated driver," but that is precisely what can happen, and what did happen here. The question is not what Officer Bailey did vis-à-vis members of the public with whom he dealt as a police officer. The question is the nature of his interaction with Ms. Washington-Pope. *That* interaction—the one at issue in this case—was purely private.

Second, even if the Court draws the inference that Ms. Washington-Pope's "criticisms" were job-related—and therefore leaving to one side the question of whether asking someone (either seriously or sarcastically) whether he has taken his medication is really a job-related question—§ 1983's "under color of law" inquiry focuses not so much on *why* the perpetrator acted, but *how*. As the *Barna* Court explained, "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity." 42 F.3d at 816; *see also Basista*, 340 F.2d at 80-81 ("Assuming arguendo that Scalese's actions were in fact motivated by personal animosity that does not and cannot place him or his acts outside the scope of Section 1983 if he vented his ill feelings towards Basista . . . under color of a policeman's badge."). Again, the *why* is relevant because it helps to *inform the how*: at the risk of tautologizing, the ultimate question is, and has always been, whether the officer has acted, or purported to act, pursuant to his authority such that his conduct was not only his, but also, in fairness, the State's.

Here, nothing about Officer Bailey's conduct indicates that he was purporting to act under state authority when he drew on Officer Washington-Pope; nor did any actual or purported state authority advance his action. Just as in *Martinez*, where "the unauthorized use of a government-issue weapon [was] too attenuated a link to hold together a section 1983 claim," 54 F.3d at 987, the fact that the "criticism" precipitating the private violence may be job-related—or, in Ms. Washington-Pope's words, her "criticisms of his job performance, which is directly

connected to Bailey's execution of his official duties"—is too attenuated to bring the private violence under color of law. Once again, the "related to" language in the case law is a restatement of the requirement that the officer either act or purport to act under official authority; in that sense, his actions necessarily relate to his official authority if they are taken under pretense of law.

Here, the uncontested verbal exchange between Officer Bailey and Officer Washington-Pope indicates not that Officer Bailey acted under any authority, actual or purported. When she asked him whether he was taking his medication, he did not tell her to stop criticizing his police work and that he had the authority to conduct it however he saw fit. He never invoked his police authority at all. Rather, when Officer Washington-Pope told him he was "f—g tripping," he challenged her back: "Say it again." After another round or two of foul language, he drew. He did nothing to invoke any authority as an officer, and Officer Washington-Pope, by her account, thought not that he had any such authority, but rather that he was known for taking things too far in the past, or handling matters violently. Her instinctive reactions, to try to escape from the car or to tase him or draw her own gun on him, were not the responses one would have to an officer asserting official authority; they were not how one would respond to a police officer acting consistent with his general duties. As the *Martinez* Court explained,

> [W]hen the victim is himself a fellow officer and the particular interaction between the two officers is of a distinctively personal nature, it can generally be assumed that the aggressor's official trappings, without more, will not lead the victim to believe that the aggressor is acting with the imprimatur of the state and, in turn, to forgo exercising his legal rights. The facts in this case are congruent with this hypothesis. The campaign of terror that Valentin mounted was patently personal in nature, *and Martinez unquestionably realized as much*; indeed, there was not the slightest indication that Valentin's conduct was undertaken pursuant to the authority of his office. *Plainly, the fact that Martinez walked away numerous times shows that he was not "so intimidated" by Valentin's status as a policeman "as to cause him to refrain from exercising his legal right[s]." Id.* at 1212.

*Martinez*, 54 F.3d at 988 n.6 (emphasis added) (second alteration in original). Officer Washington-Pope has not suggested that she doubted for a minute the propriety of meeting Officer Bailey's unlawful conduct with force of her own. By her own account, if she could have, she would have.[12]

Though Officer Bailey's alleged conduct, if it occurred, was unquestionably wrongful, it was not under color of law. A remedy, if any were to be had, might lie in state court, but "[i]t is well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state." *Mark*, 51 F.3d at 1150.

*     *     *

Because Officer Bailey did not act under color of law for purposes of § 1983, Ms. Washington-Pope cannot pursue her federal constitutional claims against him, and so the Court's inquiry vis-à-vis Mr. Bailey is at an end. Accordingly, Mr. Bailey's Motion to Dismiss is granted.

### B.      Claims Against the City of Philadelphia: Independent Municipal Liability

In Section C of its Memorandum accompanying its Motion for Summary Judgment, the City of Philadelphia argues that "[i]f this honorable court dismisses [Ms. Washington-Pope's]

---

[12] The Court construes the contested issue of fact of whether Officer Bailey could have formed intent to point his gun at Officer Washington-Pope in her favor—i.e., it finds that he could have done so, and did so, intentionally. This battle of the experts has taken place in the parties' submissions because, as they argue, intent is necessary for a Fourth Amendment seizure. But if he acted intentionally, then surely he had motives, contrary to whatever Ms. Washington-Pope means to suggest when she states that Mr. Bailey "cannot recall having any motives, let alone private ones." Washington-Pope–Bailey Mem. at 21 n.3. Regardless, even if he did not act intentionally at all (and disregarding, for the moment, that at the summary judgment stage, arguing in the alternative may have consequences), he still would not have acted under color of law. Officer Washington-Pope did not know until later that there was reason to believe he lacked intent, and of course, whether an officer acts or purports to act under pretense of law is a question of an outward manifestation of intent rather than an opportunity to plumb the depths of the perpetrator's psyche.

claims against Officer [Bailey] then the claims against the City of Philadelphia must also be dismissed" because "if Plaintiff has not suffered a constitutional injury, then a municipal liability claim cannot survive." City Mem. at 20-21 (citing *Collins v. City of Harker Heights*, 503 U.S. 115 (1992); *City of Los Angeles v. Heller*, 475 U.S. 796 (1986) (per curiam); *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3d Cir. 2003)).

The City's argument misunderstands the law in this Circuit. Although a municipality cannot be liable under § 1983 under a vicarious liability theory, *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978)), that is not Ms. Washington-Pope's argument. Rather, she contends, inter alia, that "Officer Bailey was merely a 'causal conduit' for the constitutional violation committed by the Defendant City" in the form of "a municipal policy or custom, or the deliberate indifference of city officials in adopting any such policy or custom, or . . . the failure to train and supervise the city police officers." Washington-Pope–City Mem. at 24. Of course, these are the only type of claims left standing after *Monell*: "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue," such as through a policy or custom. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

The issue that the Supreme Court has not addressed, however, is whether municipal liability may lie independent of proof that a municipal employee violated the plaintiff's constitutional rights. In the Third Circuit, it may: "It is possible for a municipality to be held independently liable for a substantive due process violation even in situations where none of its employees are liable." *Brown v. Commw. of Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) (citing *Fagan v. City of Vineland (Fagan I)*, 22 F.3d 1283, 1292 (3d Cir. 1994)). In *Fagan v. City of Vineland (Fagan I)*, the Third Circuit Court

of Appeals considered the liability of police officers and the municipality for a high-speed car chase that ended a serious accident causing death and injury. *See* 22 F.3d at 1287. Reconsidering en banc in *Fagan II* only the liability of the individual police officers who chased plaintiff's car, 22 F.3d 1296, the Court of Appeals held that "[t]he pursuing officers are liable under section 1983 if their conduct 'shocks the conscience,'" *Fagan I*, 22 F.3d at 1292 (*Fagan I* and *Fagan II* were released contemporaneously and *Fagan I* was reinstated in a manner consistent with the en banc decision, *Fagan I*, 22 F.3d at 1287 n.1).

The *Fagan I* Court was confronted with the question of "whether a municipality can be held independently liable under section 1983 in a police pursuit case when none of the pursuing police officers are liable" because they had been dismissed at summary judgment because their actions did not violate the Constitution. *Fagan I*, 22 F.3d at 1291. The *Fagan I* Court explained that

> [u]nder *Monell* and *Canton*, a municipality can be liable for a policy of failing to train police officers only if that policy causes a violation of the plaintiff's constitutional rights. The [Supreme] Court, however, did not address whether municipal liability is possible if none of the inadequately trained police officers individually violates the Constitution.[13]

*Id.* Narrowly reading *City of Los Angeles v. Heller*, 475 U.S. 796, to stand for the limited proposition that Fourth Amendment claims brought not independently against the municipality, but only against an individual officer with the municipality joined because it might bear "*respondeat superior*" liability, could not survive if the claim against the individual officer failed, the *Fagan I* Court held that

---

[13] Indeed, this proposition is also all that *Collins v. City of Harker Heights*, 503 U.S. 115, stands for. *See id.* at 122 (emphasizing "the separate character of the inquiry into the question of municipal responsibility and the question whether a constitutional violation occurred" and explaining that "[t]he city is not vicariously liable under § 1983 for the constitutional torts of its agents: It is only liable when it can be fairly said that the city itself is the wrongdoer"); *Brown*, 318 F.3d at 482 (citing *Collins*, 503 U.S. at 122, for the proposition that "for there to be municipal liability, there still must be a violation of the plaintiff's constitutional rights").

a substantive due process case arising out of a police pursuit, an underlying constitutional tort can still exist even if no individual police officer violated the Constitution. Unlike in *Heller*, the plaintiffs in this case brought separate, independent constitutional claims against the pursuing officers and the City. These claims are based on different theories and require proof of different actions and mental states. The pursuing officers are liable under section 1983 if their conduct "shocks the conscience." *Fagan v. City of Vineland*, 22 F.3d 1296 (3d Cir. 1994) (in banc). The City is liable under section 1983 if its policymakers, acting with deliberate indifference, implemented a policy of inadequate training and thereby caused the officers to conduct the pursuit in an unsafe manner and deprive the plaintiffs of life or liberty.

A finding of municipal liability does not depend automatically or necessarily on the liability of any police officer. Even if an officer's actions caused death or injury, he can only be liable under section 1983 and the Fourteenth Amendment if his conduct "shocks the conscience." *Id.* The fact that the officer's conduct may not meet that standard does not negate the injury suffered by the plaintiff as a result. If it can be shown that the plaintiff suffered that injury, which amounts to deprivation of life or liberty, because the officer was following a city policy reflecting the city policymakers' deliberate indifference to constitutional rights, then the City is directly liable under section 1983 for causing a violation of the plaintiff's Fourteenth Amendment rights. *The pursuing police officer is merely the causal conduit for the constitutional violation committed by the City.*

*Fagan I*, 22 F.3d at 1292 (emphasis added) (footnote omitted).

Ms. Washington-Pope has argued that *Fagan* applies to her facts. At this stage of the litigation, without more, the Court must agree and allow discovery to continue. If Officer Bailey's conduct deprived Ms. Washington-Pope of her liberty (not to mention the obvious—that it risked her life), then even if Officer Bailey was in a diabetic trance precluding him from developing any intent, and so did not himself violate Ms. Washington-Pope's constitutional rights, the City's potential independent liability must be evaluated. The theory, as explained by the *Fagan I* Court, is that the perpetrating officer, although he does not commit a violation himself, acts as a "causal conduit for the constitutional violation committed by the City." *Id.*

At oral argument, the City countered that *Fagan I* "created a very narrow exception to the traditional rule, that cities may not be held liable" absent an underlying constitutional violation

by an officer they employ. Tr. 18:15-17. And this exception, the City contends, "has only been

[applied] to other substantive due process claims," whereas here, "we are looking at what is

clearly a Fourth Amendment claim." Tr. 18:3-7. But there are two problems with this contention.

First, in addition to her Fourth Amendment claim against Officer Bailey, Ms. Washington-Pope

*has also* brought a Fourteenth Amendment due process claim against him. Thus, even if the

City's reading *Fagan I* is correct (i.e., that it only extends to underlying substantive due process

violations), then her independent claim against the City must stand.[14]

---

[14] Mr. Bailey argues that Ms. Washington-Pope's Fourteenth Amendment substantive due process claim against him must be dismissed because "[c]laims of excessive force"—or, presumably, seizure—"must be analyzed under the Fourth Amendment." Bailey Mem. at 14 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). His argument also seems to adopt the reasoning of the Supreme Court in *Albright v. Oliver*, 510 U.S. 266 (1994), that, in essence, where a particular constitutional amendment provides the standard by which the challenged conduct should be judged, a substantive due process claim may not lie.

But this argument is unavailing, and would continue to be if the City itself made it later. For one, as the Supreme Court explained in *County of Sacramento v. Lewis*:

> [W]e explained that *Graham*
>
> > "does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments; rather, *Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272, n.7 (1997).
>
> Substantive due process analysis is therefore inappropriate in this case only if respondents' claim is "covered by" the Fourth Amendment. It is not.

523 U.S. 833, 843 (1998). The Court "illustrated the point by saying that no Fourth Amendment seizure would take place where a pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit, but accidentally stopped the suspect by crashing into him." *Id.* at 844 (citation and internal quotation marks omitted).

Here, as in the *Lewis* Court's hypothetical, there are serious questions as to whether, separate and apart from the "under color of law" analysis, Officer Bailey's conduct on September 24, 2010, is covered by the Fourth Amendment. For instance, there is a genuine issue of material fact

But it is also not clear that the City's reasoning would in fact be correct—or that the Third Circuit Court of Appeals has even addressed this particular, rare case—i.e., if Ms. Washington-Pope had brought *only* a Fourth Amendment claim and it failed for want of conduct "under color of law." The question is whether the City itself has committed an independent constitutional violation. *See Harris*, 489 U.S. at 385. Indeed, *Fagan I* stands for the proposition that the City can independently violate the Constitution if it has a policy, practice, or custom of deliberate indifference that causes the deprivation of some constitutional right through the actions of an officer, the "causal conduit." If, as Ms. Washington-Pope alleges, the City had a policy, practice, or custom pursuant to which it was deliberately indifferent to a serious risk that Officer Bailey or diabetic officers like him might deprive other individuals of their life or liberty interests, and an officer does deprive an individual of such an interest, then those officers will have acted as a conduit through which the City caused constitutional harm.

The City's citation to *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d at 124 n.5, *see* City Supp. Mem. at 1 (Docket No. 21), is not to the contrary. In *Grazier*, the Third Circuit Court of Appeals applied *Heller*, 475 U.S. 796, and held that because the jury had determined that the police officers' conduct "did not violate the plaintiffs' constitutional rights . . . *Heller*

---

as to Officer Bailey's mental state on September 24, 2010, although for purposes of the substantive due process inquiry here, Ms. Washington-Pope may want to change her argument. *See also, e.g.*, *id.* at 843-44 ("The Fourth Amendment covers only 'searches and seizures,' neither of which took place here. No one suggests that there was a search, and . . . a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*." (citations and internal quotation marks omitted)). *But cf. supra* note 12.

Second, even if Ms. Washington-Pope's substantive due process claim against Officer Bailey were to fail, that would not bring her claim against the City out of *Fagan I*'s domain, for the reasons discussed below.

precludes a finding of municipal liability against the City." *Grazier*, 328 F.3d at 124. In a footnote citing *Fagan I*, the *Grazier* Court explained that "[o]ur Court has distinguished *Heller* in a substantive due process context," but "[h]ere, however, like *Heller* and unlike *Fagan*, the question is whether the City is liable for causing its officers to commit constitutional violations, albeit no one contends that the City directly ordered the constitutional violations." *Id.* at 124 n.5. Thus, "once the jury found that [the police officers] did not cause any constitutional harm, it no longer makes sense to ask whether the City caused them to do it." *Id.* The *Grazier* Court also noted that the *Fagan* Court had "carefully confined *Fagan* to its facts: a substantive due process claim resulting from a police pursuit," whereas *Heller* and *Grazier* "involve primarily a Fourth Amendment excessive force claim." *Id.*

But for one, although it may apply primarily to substantive due process claims, *Fagan I* is not confined to police pursuits—and not so, in fact, by the Third Circuit Court of Appeals' own statements. *See, e.g.*, *Sanford v. Stiles*, 456 F.3d 298, 314 (3d Cir. 2006) ("In [*Brown*], 318 F.3d at 482, we held that it is possible for a municipality to be held independently liable for a substantive due process violation even when none of its individual employees is liable. However, we emphasized that in order for municipal liability to exist, there must still be a violation of the plaintiff's constitutional rights."); *Carswell*, 381 F.3d at 244 ("District Courts must review claims of municipal liability 'independently of the section 1983 claims against the individual police officers.'" (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996); *Fagan I*, 22 F.3d at 1294)); *Brown*, 318 F.3d at 482. Even if Ms. Washington-Pope, like the plaintiffs in *Heller* and *Grazier*, had not presented substantive due process claims against both Officer Bailey and the City, *Grazier* is at best inapposite. It is difficult to escape the tautological maze of the *Grazier* opinion—because there is no constitutional violation, there can be no constitutional

violation. *Grazier* thus stands for the proposition that if the police officers did not use Fourth Amendment excessive force, the City cannot be liable for causing them to use excessive force (or, presumably, for using excessive force through them). But the case that the *Grazier* Court did not confront, and which would be analogous here, would be if the police officers there had, in a health-related trance, used excessive force but had done so unintentionally, such that they could not be individually liable, whereas the City had a custom, policy, or practice pursuant to which it was deliberately indifferent to the known risk of such conduct by officers with such significant chronic conditions, including the named individual defendants, under its command. That this scenario may sound *factually unlikely* does not mean it would not lead to liability as a matter of law under *Fagan I*.

By contrast, the *Fagan I* Court was dealing with a more plausible scenario, in which the distance between what the officers had done and what the City had done could render the City liable even if the officers were not. Indeed, the ostensible reason that an officer can serve as a causal conduit while not committing a constitutional violation in his own right is that the standards for individual officers and municipalities differ—"shocks the conscience" for the former and deliberate indifference for the latter. *See id.*[15] Although the *Fagan I* Court was not

---

[15] As the Third Circuit Court of Appeals pointed out in *Brown*, "the [Supreme] Court has instructed that 'deliberate indifference' is the necessary standard in order to establish § 1983 liability of a municipality." 317 F.3d at 479 (citing *Harris*, 489 U.S. at 388). In another case, the Third Circuit Court of Appeals explained,

> As we noted in *Mark*, some inconsistency exists in this circuit as to the standard of care to be applied to the underlying constitutional violation in policy, custom or practice cases. 51 F.3d at 1153 n.13. In *Fagan II*, we interpreted *Collins* to hold that the appropriate test in all substantive due process cases is whether the defendant's actions shock the conscience. *Id.* (citing *Fagan II, supra*). In articulating the standard of care for municipal liability, however, we explained that the shocks the conscience standard applied to determine the liability of the pursuing police officers under section 1983, while a deliberate indifference standard applied to determine the municipality's liability. *Id.* (quoting *Fagan v.*

confronted with a scenario, like the one here, in which the individual officer did not violate the Constitution because he did not act under color of law (or, if a jury were to so find, because he lacked the requisite intent to effectuate a Fourth Amendment seizure or even "shock the conscience"), its rationale is broad enough to encompass Ms. Washington-Pope's claim, where there was no violation by an individual officer because he did not act under color of law:

> If we conditioned municipal liability on an individual police officer's liability in every case, it might lead to illogical results. A municipality would escape liability whenever the conduct of the acting police officer did not meet the "shocks the conscience" standard, even though municipal policymakers, acting with deliberate indifference or even malice, implemented a policy which dictated his injury-causing actions. It is easy to imagine a situation where an improperly trained police officer may be ignorant of the danger created by his actions and inflicts injury. Meanwhile, the city's policymakers, with a wealth of information available to them, are fully aware of those dangers but deliberately refuse to require proper training. The officer may escape liability because his conduct did not "shock the conscience." It does not follow, however, that the city should also escape liability. The city caused the officer to deprive the plaintiff of his liberty; the city therefore has violated the plaintiff's Fourteenth Amendment rights.

*Fagan I*, 22 F.3d at 1292 (3d Cir. 1994). And, as explained above, the Third Circuit Court of Appeals appears not to have been confronted with a case in which a constitutional harm cognizable under any other amendment (say, the Fourth) has been established in all respects except for an intent or color of law element. Such cases would be distinct from *Heller* and *Grazier*, in which juries found that no constitutional harm at all was caused because space for independent municipal liability would potentially exist for a finding that the City's deliberate

---

*City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994) (*Fagan I*). Although *City of Canton* predated our opinions in *Fagan I & II* and the Supreme Court's decision in *Collins*, we continue to recognize the application of the deliberate indifference standard to ascertain municipality liability as the constitutional standard in failure to train police officers cases. *See, e.g.*, *Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir. 1996).

*Kneipp*, 95 F.3d at 1212 n.27.

indifference, through a policy, custom, or practice, caused the constitutionally violative behavior by the individual officers.

In any case, notwithstanding any persuasive power the City's effort to distinguish *Fagan I* might have, Ms. Washington-Pope's Fourteenth Amendment substantive due process claim against Officer Bailey also means that even if the Third Circuit Court of Appeals would limit the *Fagan* doctrine in the hypothetical circumstances described above, it still applies here. Though *Fagan I* has been criticized,[16] and several other courts of appeals, declining to follow it, have thereby created a circuit split,[17] *Fagan I* remains the law of the this Circuit. *See, e.g.*, *Sanford*, 456 F.3d at 314; *Brown*, 318 F.3d at 482.

---

[16] For criticism within the Third Circuit, see, for example, *Mark*, 51 F.3d at 1153 n.13.

[17] For instance, the Seventh Circuit Court of Appeals explained:

> We note that a recent Third Circuit decision, [*Fagan I*], held that a city could be liable under *Monell* even though the individual officer was not liable. *Fagan* attempts to distinguish *Heller* on the grounds that in *Heller*, the plaintiff was only seeking to hold the City of Los Angeles liable under a theory of *respondeat superior*. That cannot be the case since Monell expressly holds that there is no cause of action for *respondeat superior* liability against a municipal corporation under 42 U.S.C. § 1983. *Monell*, 436 U.S. at 694-95. Thus we choose to follow the clear holding of *Heller* that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *Heller*, 475 U.S. at 799.

*Thompson v. Boggs*, 33 F.3d 847, 859 n.11 (7th Cir. 1994); *accord Treece v. Hochstetler*, 213 F.3d 360, 364 (7th Cir. 2000) (citing *Thompson*); *Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1022 n.9 (7th Cir. 2003) (citing *Treece*). Several other courts of appeals have also explicitly disagreed with *Fagan I* and held that municipalities cannot be independently liable where their officers have committed no constitutional violation. *See, e.g.*, *Evans v. Avery*, 100 F.3d 1033, 1039-40 (1st Cir. 1996) ("[W]e believe that the *Fagan* panel improperly applied the Supreme Court's teachings."); *Spencer v. Roche*, 659 F.3d 142, 150 (1st Cir. 2011) ("[T]he absence of an anchoring constitutional violation dooms the claim that the City failed properly to train the officers. *See Evans v. Avery*, 100 F.3d 1033, 1040 (1st Cir. 1996)."), *cert. denied*, 132 S. Ct. 1861 (2012); *Young v. City of Mount Ranier*, 238 F.3d 567, 579 n.9 (4th Cir. 2001) ("The Parents urge us to ignore our own cases and instead accept the analysis of the Third Circuit Court of Appeals. We are, of course, bound by the precedent in our own circuit." (citation omitted));

*Trigalet v. City of Tulsa*, 239 F.3d 1150, 1154-55 & n.4 (10th Cir. 2001) (noting that "[s]upport for our position is found in the decisions of our sister circuits as well" (citing cases) and "[o]ther courts have disagreed with the *Fagan* decision" (citing cases)); *Best v. Cobb County*, 239 F. App'x 501, 504 (11th Cir. 2007) (per curiam) ("Although the police pursuit ended tragically, there was no constitutional violation. Consequently, the plaintiffs' claim against the county cannot survive summary judgment." (citing *Fagan I* with a *but see*)).

The law in two courts of appeals is less clear but potentially more nuanced. In the Eighth Circuit, for example,

> [t]he appropriate question under *Heller* is whether a verdict or decision exonerating the individual governmental actors can be harmonized with a concomitant verdict or decision imposing liability on the municipal entity. The outcome of the inquiry depends on the nature of the constitutional violation alleged, the theory of municipal liability asserted by the plaintiff, and the defenses set forth by the individual actors. We do not suggest that municipal liability may be sustained where there has been no violation of the plaintiff's constitutional rights as a result of action by the municipality's officials or employees. After all, a municipality can act only through its officials and employees. However, situations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation.

*Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002) (citations omitted); *see also Moyle v. Anderson*, 571 F.3d 814, 818 (8th Cir. 2009) ("There need not be a finding that a municipal employee is liable in his or her individual capacity before municipal liability can attach." (citing *Speer*, 276 F.3d 980)). *But see Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* failure to train municipal liability."). And in the Second Circuit,

> under *Monell* municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants. *Cf. City of Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986) (per curiam) (where alleged constitutional injury is caused solely by named individual defendant who is found not liable, municipal liability cannot lie). It is therefore possible that a jury could find the Commission and the County of Orange liable for the alleged violations of Barrett's First Amendment rights even after finding that Lee and Colonna are not liable. Lee and Colonna may have been the most prominent figures in Barrett's termination; they may have issued plaintiff's termination letter. But the Commission is a multi-member body that makes its determinations as a group, and many of the adverse employment actions complained of by Barrett, including the decision to terminate him as Executive Director of the Commission, were taken by the Commission as a whole, not by Lee and Colonna by themselves. It is therefore possible that the defendant

For these reasons, the Court denies the City's Motion for Summary Judgment—more specifically, Section C of its Motion—with prejudice because it is an incorrect account of the governing law. Further discovery will determine whether Ms. Washington-Pope has raised a triable issue of fact. To prevail on her Fourteenth Amendment independent municipal liability claim, she will ultimately have to prove that the City had a policy or custom of failing to train or

---

commissioners did not as individuals violate Barrett's rights, but that the Commission did.

*Barrett v. Orange Cnty. Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999). *But see Dodd v. City of Norwich*, 827 F.2d 1, 9 (2d Cir. 1987) (Pratt, J., dissenting) (criticizing the majority because "to apply *Heller*, where the police officer did not follow the allegedly unconstitutional municipal policy, to this case where Larson 'followed the city's gun use policy to the letter', establishes a 'reverse respondeat superior' principle to the effect that the city cannot be held liable unless the officer is also held liable'").

By contrast, the Ninth Circuit Court of Appeals has agreed with *Fagan I. See Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) (per curiam) ("The district court did not err by denying the City's motion for judgment as a matter of law on the *Monell* claim based on the jury's exoneration of the individual officers alone. If a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under § 1983.); *id.* at 917 n.4 ("This is true whether the officers are exonerated on the basis of qualified immunity, because they were merely negligent, or for other failure of proof." (citing, inter alia, *Fagan I*, 22 F.3d at 1291-94)); *accord Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1142-43 (9th Cir. 2012) ("We have repeatedly held that '[i]f a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under § 1983.'" (quoting *Fairley*, 281 F.3d at 917)).

Still other courts of appeals have avoided the question thus far. *See Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011) ("We have yet to address, directly, whether a municipality can ever be held liable for failure to train its officers adequately where the officers did not commit any constitutional violation; we need not decide that issue here. Even if the answer were in the affirmative, Mrs. Carnaby has not produced sufficient evidence to meet all the requirements for municipal liability."); *Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005) ("Other circuits have also concluded that a municipality may be liable under *Monell* even though no employee is liable. . . . Assuming for the sake of argument that this Circuit permits a municipality to be held liable in the absence of any employee's committing a constitutional violation, the remaining question for us then is whether the City's policy makers' decisions regarding suicide prevention were themselves constitutional violations, as plaintiff contends." (citing *Fagan I*, 22 F.3d at 1294)); *Estate of Harbin v. City of Detroit*, 147 F. App'x 566, 575 (6th Cir. 2005) (Russell, J., concurring in the judgment) ("The court does not have to find any particular officer liable before the City can be held liable, but the court must find that the City caused a violation of Plaintiff's rights." (citing *Gray*, 399 F.3d at 617)).

supervise as well as "a direct causal link between [that] municipal policy or custom and the alleged constitutional deprivation." *Harris*, 489 U.S. at 385. Those are questions for another day.

**CONCLUSION**

For the foregoing reasons, Mr. Bailey's Motion for Summary Judgment is GRANTED and all claims against him are dismissed. The City of Philadelphia's Motion for Summary Judgment is DENIED, with prejudice only as to Section C, and discovery may continue as between the City and Ms. Washington Pope.

\*　　\*　　\*

An Order consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge