**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **YOLAINA WASHINGTON-POPE,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA,** | : | **No. 12-4300** |
| **Defendant.** | : | |

## M E M O R A N D U M

PRATTER, J.                                                     NOVEMBER 23, 2015

### I.   INTRODUCTION

For a second time in this case, the Court is called upon to rule on summary judgment motions.  In 2013, the Court granted Defendant Officer William Bailey's Motion for Summary Judgment and denied the City of Philadelphia's Motion for Summary Judgment.  *Washington-Pope v. City of Philadelphia*, 979 F. Supp. 2d 544 (E.D. Pa. 2013) ("*Washington-Pope I*").  The City has now filed this second motion seeking to extricate itself from the case.  The City's principle argument is that Plaintiff Yolaina Washington-Pope has failed to come forward with sufficient evidence to establish municipal liability pursuant to *Monell v. New York City Dep't of Social Services,* 436 U.S. 658 (1978). After reviewing the record and the parties' submissions, however, the Court must conclude that Ms. Washington-Pope has raised an issue of material fact regarding the existence of a municipal policy within the department that operated as the "moving force" behind her injuries.  Consequently, the Court is required to deny the Motion.

### II.   FACTUAL AND PROCEDURAL BACKGROUND

The Court's 2013 summary judgment opinion presents a substantial summary of the facts surrounding the incident which gave rise to this litigation.  *See Washington-Pope I* at 546-49.

Given the different issues raised in the City's Motion here, however, we will recount the facts established therein, particularly those essential to this holding.

In 2010, Yolaina Washington-Pope was employed as a Philadelphia police officer.  On the evening of September 24, she was on duty, in a patrol car patrolling West Philadelphia with her partner, Officer William Bailey.  Deposition of Yolaina C. Washington-Pope, 16 (March 22, 2013) (hereinafter "Washington-Pope at __").[1]  She had previously served as Officer Bailey's field training officer and during her time with him, she had observed him demonstrate a pattern of immature and inappropriate behavior.  She had reported this conduct to her superiors and requested a different partner.  Washington-Pope at 29-30.

Early in the shift on September 24, Officer Bailey "began behaving strange[ly]." On Duty Incident 09-23-10 Report, 2 (September 27, 2010).[2]  He reported to Officer Washington-Pope that he heard noises in the car (which she did not) and at one point he stopped the car and searched it using his flashlight.  *Id.*  This search yielded nothing and the officers continued their patrol.  Later in the shift, Officer Bailey expressed to the Plaintiff that he thought a car was following them, but Officer Washington-Pope saw no such car.  Washington-Pope at 47.  Officer Bailey also made a reference to eating and drinking, but when Officer Washington-Pope asked if he would like to get some food, he replied that he had already eaten.  *Id.* at 32.

Officer Bailey's History of Diabetes

Officer Bailey suffers from Type-1 diabetes and has for his entire life.  Deposition of Officer William Bailey, 18-19 (March 7, 2013) (hereinafter "Bailey at __")[3]; Expert Report of Jonathan Williams, 1 (November 13, 2014) (hereinafter "Williams Rep. at __").[4]  Type-1

---

[1] Attached as Exhibit B to Doc. No. 36.
[2] Attached as Exhibit D to Doc. No. 36.
[3] Attached as Exhibit G to Doc. No. 36.
[4] Attached as Exhibit C to Doc. No. 36.

diabetes is a disease which often requires the continuous use of insulin for survival.  It is undisputed that Officer Bailey's diabetes was uncontrolled; he suffered from erratic blood glucose control, which put him at an increased risk of recurrent severe hypoglycemia. Williams Rep. at 1.  Hypoglycemia can involve sudden disorientation or incapacitation.  Expert Report of Dr. Robert Swotinsky, 5 (November 13, 2014) (hereinafter "Swotinsky Rep. at __").[5] According to expert reports submitted by the Plaintiff (and not disputed by the City) the use of insulin is a safety concern for any individual required to carry a gun for his or her job.  *Id.*

In light of the risk, certain agencies have adopted standards regarding a diabetic police officer's fitness for duty.  In 2006, the American Diabetes Association (ADA) and the American College of Occupational and Environmental Medicine (ACOEM) developed a national standard for determining a diabetic police officer's fitness for duty.  This protocol requires a "narrative report from the treating endocrinologist or other physician knowledgeable about diabetes management certifying whether the law enforcement officer has been stable and is educated and informed of procedures for managing his condition and responding to complications as they arise."  Swotinsky Report at 6 (citing ADA/ACOEM 2006 Fitness for Duty Examination Protocol for Police Officers with Insulin-Dependent Diabetes).   Other law enforcement departments and agencies exclude from service anyone who has had a severe hypoglycemic episode during the previous five years.  *Id.* at 5.  The ADA advises that two or more episodes of severe hypoglycemia per year may indicate that a person cannot safely operate a motor vehicle. *Id.* at 9 (citing American Diabetes Association, Position Statement: Diabetes and Driving, Diabetes Care 2013;36:S80-S85).  Pursuant to all these standards, hypoglycemia—particularly repeated episodes of incapacitating hypoglycemia—can be cause for exclusion from jobs or tasks that involve significant risk of harm to employees or the public.

---

[5] Attached as Exhibit U to Doc. No 36.

Officer Bailey was evaluated by department doctors Oriente and Murray in April and September 2008, prior to his entering the Philadelphia Police Academy.  During these exams, Office Bailey informed the department physicians that he was diabetic and took insulin.  During his September 2008 exam, his lab results indicated fasting blood sugar levels of 190 mg/dl and 4+ glycosuria (sugar in his urine). Swotinsky Rep. at 4; Deposition of Dr. George Hayes, 75-76 (May 21, 2013) (hereinafter "Hayes at __").[6] Such results are indicative of uncontrolled diabetes. Following these preplacement exams, however, he was approved for service, *id.* at 70-71, but instructed by Dr. Murray that he should follow up with a specialist regarding his diabetes.  Dr. Murray did not verify that these appointments took place.  Drs. Murray and Oriente did not then report to superiors their concerns regarding Officer Bailey's diabetes.

After this set of initial exams, but prior to the evening of September 24, 2010, Officer Bailey experienced three hypoglycemic incidents on the job which resulted in his being hospitalized for low blood sugar.  The first incident occurred in May 2009 while Officer Bailey was still a cadet at the Philadelphia Police Academy.  He testified that, following a particularly grueling run that morning, his low blood sugar forced him to excuse himself from class in order to get something to eat.  Bailey at 29-30.  After he ate, he sat down in the hallway and waited for his blood sugar to come back up.  This apparently took some time and eventually his instructors came looking for him.  After they found him, they decided to call an ambulance to take him to the hospital.  *Id.* at 30.  Accounts of the incident differ, but there is no evidence on the record that he was violent at this time.[7]

---

[6] Attached as Exhibit I to Doc. No. 36.
[7] The Plaintiff states in her papers that Officer Bailey was acting "bizarre" and was chased by his instructors.  *See* Doc. No. 35 at 9.  The Plaintiff, however, relies upon the hearsay statements of a fellow police officer who was attending the academy at the same time as Officer Bailey.  *See* Statement of Officer Adam Stennett, 2-3 (October 8, 2010) (hereinafter "Stennett at __").  This Officer stated that,

A second incident occurred while Officer Bailey was on foot patrol with several other officers.  Officer Adam Stennett, one of the officers present, recounted in a statement that Officer Bailey was drinking an Arizona Iced Tea when his hand began shaking so badly he dropped the bottle.  Stennett at 2.  He then began "duck walking," which Officer Stennett describes as: "he would go forward as he went down on each knee and was shaking."  *Id.* Initially his colleagues thought Officer Bailey was joking, but they eventually realized what was happening and radioed for an ambulance.  *Id.; see* Bailey at 41.  At the hospital, Officer Bailey was told by the treating physician that he needed to carry an insulin pump to help him manage his diabetes. Deposition of Officer Cheryl Newton, 11-13 (October 8, 2014).

The final incident occurred in September 2009, outside the 19th District police headquarters.  At the end of his duty assignment, Officer Bailey was observed by Officer Terrelle Green, standing outside the station near his police cruiser.  *See* Statement of P/O Terrelle Green, 2 (October 20, 2010) (hereinafter "Green at __").[8]  As it was the end of his shift, Officer Bailey was supposed to go inside the station and turn in his radio.  He failed to do so, however, and remained outside.  Officer Green stated that he appeared "a little dazed." *Id.*  He observed Officer Bailey eating something by his car and then later taking his "tablets," which Officer Green understood were intended raise his blood sugar.  *Id.* After Officer Bailey failed to come in the station for some period of time, Lieutenant Demetrius Monk and the sergeant on duty went out to attempt to get Officer Bailey to come inside.  *Id.*

---

while he heard Officer Bailey "ran down the hallway and the instructor's [sic] had to chase him," he did not actually witness this event.  *Id.* at 3.

While the Court is able to consider testimony presented as hearsay on a motion for summary judgment—for example, testimony via affidavit and deposition—it must be possible for the underlying testimony to be presented in an admissible form at trial.  *Escanio v. United Parcel Serv.*, 538 F. App'x. 195, 201 (3d Cir. 2013).  Here, the live testimony of Officer Stennett regarding this event would still be inadmissible hearsay at trial.  Consequently, the Court cannot consider it.  Nevertheless, even if the Court were to consider this evidence, it would not substantially alter the Court's analysis.

[8] Attached as Exhibit M to Doc. No. 36.

Officer Green reported that Officer Bailey was "laughing and joking" but moving away from the other officers and still refusing to come inside.  Officer Green also saw him "unsnap" and then re-snap the holster holding his service weapon.  He was not observed to put his hand on his gun, however.  *Id.*  Eventually Lieutenant Monk took Officer Bailey's gun away and led him inside.   While hearsay accounts indicate that he was also chased around the patrol car, Officer Yolaina Pope, On Duty Incident 09-24-10,  2 (September 27, 2010) (hereinafter "Pope Statement at __")[9], the eyewitness account in the record does not support this version of events, Green at 2. Officer Green stated that the officers did not have to chase Officer Bailey or grab him or hold him.  *Id.*

The record indicates that all involved viewed this as a serious and potentially dangerous incident. Deposition of Demetrius Monk, 31 (June 5, 2014) (hereinafter "Monk at __")[10]; Deposition of Kenneth Kimchuk, 55 (June 5, 2014) (hereinafter "Kimchuk at __").[11] Lieutenant Monk testified that a properly trained and competent officer would only unsnap his holster if he was planning on taking his gun out for some reason.  Given the circumstances, he disarmed Officer Bailey because he felt that he couldn't "take the chance" of doing otherwise.  Monk at 31-32. Lieutenant Monk testified that he filed a report with his superior, Captain Melvin Singleton, detailing the incident.  Monk at 33.  Captain Singleton testified, however, that he did not personally review this report.  Deposition of Captain Melvin Singleton, 47-48 (April 2, 2014) (hereinafter "Singleton at __").[12]

After these incidents, Officer Bailey was examined by the department's Employee Medical Services, located at 19th Street and Fairmont Avenue in Philadelphia.  Bailey at 45; *see*

---

[9] Attached as Exhibit D to Doc. No. 36.
[10] Attached as Exhibit O to Doc. No. 36.
[11] Attached as Exhibit P to Doc. No. 36.
[12] Attached as Exhibit Q to Doc. No. 36.

Swotinsky Rep. at 6.    Dr. George Hayes, a physician who examined Officer Bailey and served as the head of the Department's Employee Medical Services, testified that Officer Bailey's diabetes made it difficult for him to control his blood sugar.  Hayes at 55. Consequently, he was instructed by Dr. Hayes and others, to see a specialist in order to get his blood sugar under control.  Hayes at 91-93.  Dr. Hayes testified that Officer Bailey should have been seeing an endocrinologist "all along."  Hayes at 100.  Officer Bailey was nevertheless allowed by Dr. Hayes and Employee Medical Services to return to duty and, ultimately, Officer Bailey did not see any specialist prior to the incident in question.  Prior to the night of September 24, 2010, Officer Bailey was never required by the department, as a condition of his continued employment, to see a specialist to help him manage his diabetes.  Bailey at 22.

<u>The September 24, 2010 Incident</u>

Consequently, when Officer Washington-Pope found herself in the patrol car with Officer Bailey on the night of September 24, 2010, he had not been seeing a specialist and his diabetes was not being managed by an endocrinologist.  After Officer Bailey's strange behavior earlier in the evening, the two officers received a call to proceed to a specific address in response to a complaint.  Officer Bailey was driving. While in route to the call, he missed the turn to their destination.  The Plaintiff noted this and Officer Bailey responded by asking why she was always picking on him.  At this point, Officer Bailey started verbally rambling.  The Plaintiff asked him if he had taken his "medication."  Officer Bailey responded confrontationally by asking what medication and why he would need any such medication. Then, as Officer Washington-Pope testified, the following interaction took place:

> A.      When we left the first assignment – I mean the second assignment, the third assignment was around the corner and up the street, if I'm not mistaken.  I remember going on radio saying we'll pick that up, we're around the corner.

Officer Bailey went past the street that we were supposed to go to, and when I said something to him, he asked me why I always pick on him, something to that effect, and at that point, I noticed he was rambling, and as we're fussing back and forth, I guess like brother and sister or whatever, I asked him, Did you take your medication?

Q.      Okay.

A.      And he says, What medication? And I said to him, Your psychotic medication.  And he says, What? I said, Your sugar meds. And he said, Well, why would I do that? And I said, Because you're fucking tripping.  Officer Bailey says, What do you mean? I said, You're fucking tripping.

And through all this, I'm still giving him directions as to where we're supposed to turn.  And he says, You got a problem with me?  And I said yeah, You're fucking tripping.  By this time, we're at the corner ready to make a left and Officer Bailey says, Say it again, but when he said Say it again, he unholstered – not unholstered, but unsnapped his holster, and I said, You're fucking tripping, and he pulled his gun out and he put it on his lap.

Now, he turned the corner and we're riding up towards the address.  I'm writing paperwork for the first two assignments we had as well as looking for the address, and Officer Bailey says, I bet you won't say it again, but out –

Q.      Take your time

A.      – out of my peripheral I saw him raising the gun up towards my head, and I kind of was still leaning this way, and I turned and the bell of the gun was right by my eyes.

Can I?

Q.      Yeah, you can take a tissue

A.      And he – he had this cold look, and I said, Bailey, you really going to shoot me?  And he didn't say anything.  He just had this mean look like I bet you won't say it no more.

Washington-Pope at 38-40. Officer Bailey eventually put the gun away.  *Id.* at 41.

Officer Bailey's service weapon was a Glock 9-millimeter handgun.  It has a capacity of 16 rounds in the magazine with one round in the chamber. This handgun requires between four and five pounds of pressure on the trigger in order to discharge a round and does not include a traditional safety mechanism.  *See* Bailey at 35-39.

8

After the incident, the two officers got out of their car and walked up to the address where they had been called, but there was no response to their knock.  When they returned to the patrol car, the Plaintiff attempted to get in the driver's seat so as to prevent Officer Bailey from driving in his condition, but he got to the driver's seat first.  Shortly thereafter, the officers conducted a traffic stop after Officer Bailey observed a car run a red light.  During the course of the stop, Officer Washington-Pope indicated that Officer Bailey was "talking normal" but that while searching the driver, Officer Bailey was behaving oddly with regards to his movements and body position relative to the driver.  After the traffic stop, the two officers returned to headquarters, where Officer Bailey parked in the wrong headquarters parking lot, appeared confused and was sweating profusely.

During their shift, Officer Washington-Pope did not radio for help because she did not want to cause a scene and embarrass Officer Bailey.  She also testified that she wanted to ensure Officer Bailey was properly treated.

Upon returning to the station, Officer Washington-Pope sought out the assistance of her superiors.  She also disarmed Officer Bailey and gave his gun to a corporal.   She then took Officer Bailey to a neighboring firehouse so that he could be assisted by a medic.  When they arrived, however, all the medic units were out on calls.  By this time, Officer Bailey appeared to be talking normally and asked why they were at the fire station.  He then told Officer Washington-Pope and the corporal who was then present, that he had diabetes and went to look for his medication in his car.  After he was unable to find this medication, he returned to the station.  The Plaintiff was eventually ordered to get Officer Bailey some food and then drive him to the hospital.

As a result of her experience the night of September 24, Officer Washington-Pope has experienced many symptoms of severe trauma.  According to the report of Stephanie Samuels, a licensed social worker, Officer Washington-Pope has been diagnosed with Complex PTSD, Panic Attacks, Agoraphobia, and Major Depression.  Expert Report of Stephanie Samuels, 1 (December 2, 2014) (hereinafter "Samuels Rep. at __").[13]  Ms. Samuels indicates that she had met with Officer Washington-Pope some 48 times; based upon these meetings it is her professional opinion that Officer Washington-Pope's ability to earn a living has greatly diminished due to not being able to trust co-workers generally, and police officers in particular. Samuels Rep. at 18.  Following her experience with Officer Bailey, she is unable to work in law enforcement because of her inability to interact with uniformed police officers.  *Id.* She suffers from anxiety attacks and bouts of uncontrolled crying. She continues to fight such anxiety attacks, which occur during the day and upon waking up from sleep.  *Id.* at 11.  They cause her to feel "agitated, lightheaded, palpitations, shortness of breath, nausea which leads to vomiting, as well as shaking and sweats.  She feels like she is losing control."  *Id.*

Departmental Actions

The only remaining defendant at this point is the City of Philadelphia.  As discussed below, in order to establish municipal liability, the Plaintiff must show that her injuries were the result of a departmental policy or custom.  The instant Motion, therefore, turns on whether such a policy or custom exists in this case.  In order to raise a triable issue of fact regarding such a policy or custom, the Plaintiff must put forward evidence from a number of experts and deposition testimony from department sources.  The Defendant has not put forward any expert testimony to rebut the Plaintiff's experts or filed any motions *in limine* to exclude their proposed testimony.

---

[13] Attached as Exhibit S to Doc. No. 36.

Dr. Jonathan Williams was retained by the Plaintiff to opine on the department's medical exam policy.  Dr. Williams is an Assistant Professor of Medicine at the Harvard Medical School and the Co-Director of the Cardiovascular Endocrinology Genetics Program, Division of Endocrinology, Diabetes and Hypertension, at Brigham and Women's Hospital. He is board certified in endocrinology, diabetes and metabolism (ABIM) and internal medicine.  Dr. Williams will testify that the City failed to implement a policy requiring officers with diabetes to see a specialist and have their condition under control prior to being cleared for duty.  Williams Rep. at 3. According to Dr. Williams, such a specialist:

> Would [have] provided the required standard of care to both evaluate the risk of hypoglycemia under the setting of Office Bailey's occupation, and instituted a more appropriate and safe insulin program.  These are experts that would not be available to a non-specialist.  Policies should [have] been in place to require Officer Bailey to relinquish his firearm and/or require his suspension from the police force if he declined to follow through with his treatment instructions, take medications prescribed, or in any way contribute to the lack of care of his diabetes.

*Id.* at 3-4.

Captain Joseph DiLacqua, who served as the head of the Philadelphia Police Department Safety Office, confirmed that at the time Officer Bailey joined the police force, the department did not require an officer like Officer Bailey receive endocrinological treatment as a condition of his medical clearance for work.  Deposition of Joseph DiLacqua, 27 (February 17, 2014) (hereinafter "DiLacqua at __").[14]  Dr. Hayes, the City's Medical Director, had the responsibility to determine whether an officer was fit to return to duty.  Dr. Hayes is not an endocrinologist. According to John Gaittens, a former Deputy Commissioner and Head of the Philadelphia Police Department Safety Office,  the police department did not have any input into how the medical

---

[14] Attached as Exhibit X to Doc. No. 36.

exams took place. Deposition of John Gaittens, 45 (April 3, 2014) (hereinafter "Gaittens at ___").[15]

The department was aware, however, of the dangers posed by uncontrolled diabetes.  Dr. Robert Swotinsky, a physician board certified in occupational medicine, is prepared to testify that police officers were trained that diabetes is common and when uncontrolled can cause mental status changes and potentially violent behavior.   Swotinsky Rep. at 1.  Dr. Swotinsky has served as a consultant and examining physician for law enforcement agencies, including the Federal Bureau of Investigation, the U.S. Secret Service, and the Boston Police Department.  *Id.* He has also consulted with several national insurers on employee fitness for duty.  *Id.*  He will provide testimony to the effect that police officers with poorly controlled diabetes pose a safety risk and should not be allowed to handle a gun.  *See id.* at 15.  Dr. Williams will also testify that an officer with uncontrolled diabetes would pose a danger to others.

The expert testimony of Drs. Williams and Swotinsky regarding the known and obvious risks related to uncontrolled diabetes, is echoed by supervisory officials in the police department. Captain Melvin Singleton, who had command over Officer Bailey at the time of the incident in question, acknowledged that police officers with uncontrolled diabetes pose a danger to themselves and others.  Singleton at 13. Likewise, former Deputy Commissioner Gaittens, testified at his deposition that it was common knowledge within the police department that people with uncontrolled diabetes have altered mental states and that it would be no surprise to the department that people can do dangerous things when experiencing complications of uncontrolled diabetes.  Gaittens at 47-48.

Frank Wallace, Plaintiff's police policies expert, will testify regarding the command structure of the Philadelphia Police Department and the City's Medical Authorities.  Expert

---

[15] Attached as Exhibit H to Doc. No. 36.

Report of Frank D. Wallace, 35 (November 13, 2014) (hereinafter Wallace Rep. at __").[16]  While with the department, Mr. Wallace served as a Captain as well as the Assistant Director of the Management Review Bureau, which was responsible for conducting policy audits and reviewing and revising department policies and directives.  Based upon his review of the record, he has determined that the command structure had adequate warning of Officer Bailey's condition, its uncontrolled nature, and the danger that it presented.  Wallace Rep. at 32-33. He stated that "[i]t is my professional opinion, based on my command level experience, that the Philadelphia Police Department and its Medical Authority had adequate reason to either force specialized treatment or terminate Officer Bailey before this foreseeable incident took place." *Id.* at 35. Mr. Wallace states that his experience tells him that "Officer Bailey would have been arrested and fired if this incident involved a civilian instead of a fellow police officer."  *Id.*

III.   **STANDARD OF REVIEW**

The Court laid out the applicable standard of review on summary judgment in *Washington-Pope I* and the Court will apply the same standard here.  A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Glenn Distributors Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 299 (3d Cir. 2002); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law. *See Anderson v.*

---

[16] Attached as Exhibit V to Doc. No. 36.

*Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Further, a court may not weigh the evidence or make credibility determinations. *Boyle v. Cty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). Nevertheless, the party opposing summary judgment must support each essential element of his or her opposition with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The court may grant summary judgment if the Plaintiff's version of the facts, as a matter of law, do not entitle her to relief: "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.   <u>DISCUSSION</u>

In its Motion for Summary Judgment, the City of Philadelphia asserts that the Plaintiff's complaint should be dismissed for three reasons.  Memorandum of Law in Support of Defendant City of Philadelphia's Motion for Summary Judgment, 5 (December 5, 2014) (hereinafter Def. Memo. at __.").[17]  First, the City argues that the Plaintiff's Fifth Amendment claims must be dismissed because the Fifth Amendment only protects against federal government action and does not limit the actions of state officials.  Second, the City argues that, based upon the Court's decision in *Washington-Pope I* granting summary judgment in favor of Officer Bailey, the Plaintiff cannot show that the City caused her to suffer a constitutional injury under § 1983. Finally, the Defendant asserts that the Plaintiff has not adduced evidence to show that the City maintains a policy or custom of deliberate indifference to the known, serious risks to which the Plaintiff was exposed.

---

[17] Defendant's Memorandum of law is filed on the ECF docket at document number 32.  As the memorandum is not individually paginated, the page numbers refer to the page numbers of the ECF filed document.

a. __Claims Under the Fifth Amendment__

The City first challenges the authority under which the Plaintiff has brought her claims. Def. Memo at 7. The First Amended Complaint states that the City's conduct violated Plaintiff's civil rights to substantive and procedural due process under the Fourth, *Fifth* and Fourteenth Amendments to the U.S. Constitution. (Doc. No. 3 (emphasis added)). The Defendant argues that, to the extent Ms. Washington-Pope's claims are based on the due process clause in the Fifth Amendment, they must be dismissed as this Clause does not apply to state actors. The Plaintiff's papers did not address this argument.

This Court analyzed this issue in *Washington-Pope I,* and explained that Officer Washington-Pope's substantive due process claims against the City could be brought under the Fourteenth, and not the Fifth Amendment.

> [I]t is worth noting that to the extent that she contends that her Fifth Amendment claim sounds in substantive due process (the only plausible reading of her Complaint based on the facts presented), she must rely instead on the Fourteenth Amendment's Due Process Clause, which applies to state and local actors, rather than the Fifth Amendment's Due Process Clause, which applies to federal actors.

*Washington-Pope I*, at 552 n.1. The right to due process under the Fifth Amendment only applies to limit actions by the federal government. *Caldwell v. Beard*, 324 F. App'x. 186, 189 (3d Cir. 2009) (citing *Riley v. Camp*, 130 F.3d 958, 971 (11th Cir. 1997)); *Good v. City of Sunbury*, 352 F. App'x. 688, 689 (3d Cir. 2009); *Damiano v. Scranton Sch. Dist.*, No. CV 3:13-2635, 2015 WL 5785827, at *5 (M.D. Pa. Sept. 30, 2015); *Collinson v. City of Philadelphia*, No. CIV.A. 12-6114, 2015 WL 3622728, at *8 (E.D. Pa. June 10, 2015). Here, the Plaintiff's claims are brought against the City of Philadelphia, a non-federal entity. Given that there are no claims

asserting depravation of rights by a federal actor, the Court will dismiss Officer Washington-Pope's claims to the extent they are brought under the Fifth Amendment.[18]

### b. __Municipal Liability Without Predicate Constitutional Injury__

Next, the City argues that the claims against it must be dismissed based upon other aspects of the Court's ruling in *Washington-Pope I* dismissing the claims against Officer Bailey. Def. Memo at 7-8.  This argument was previously raised and ruled upon.  *Washington-Pope I,* at 573-80.[19]  The Defendant argues that, as a matter of law, even if departmental regulations may have authorized unconstitutional action, there can be no municipal liability unless plaintiff can prove that an individual agent of the municipality is liable for her injuries. In *Washington-Pope I,* the Court commented on how this argument betrays a misunderstanding of the law of the Circuit.

---

[18] Plaintiff has also brought claims for violations of procedural and substantive due process under the Fourteenth Amendment.  The Fourteenth Amendment due process right applies against the states and serves roughly the same purpose as the Fifth Amendment due process clause does against the federal government.  *See Paul v. Davis*, 424 U.S. 693, 723 (1976) ("The Due Process Clause of the Fifth Amendment, like the Due Process Clause of the Fourteenth Amendment, protects 'liberty' interests."); *DeMateos v. Texaco, Inc.*, 562 F.2d 895, 900 (3d Cir. 1977).  Ultimately, however, dismissing the claims to the extent they were brought under the Fifth Amendment will not have any significant impact on the substance of the Plaintiff's case.

[19] The City argued in its previous motion for summary judgment that a municipality could not be liable absent a showing of constitutional violation by one of its agents.  (Doc. No. 17).  The Court considered the argument but determined that it rested on a misunderstanding of the distinction between *Monell* and vicarious liability and relied on an incorrect account of governing Third Circuit law. *Washington-Pope I*, at 573-74.  The holding in *Monell* is significant precisely because it requires a plaintiff prove the municipality is liable for its own actions rather than the actions of its employees.  In essence, the Defendant would have the Court adopt a rule that would contradict this standard by requiring a showing of vicarious liability as a predicate to showing a municipality liable. The Court denied the argument with prejudice when it was included in the Defendant's prior motion for summary judgment.  *Id.* at 580.   As the Court has previously considered and ruled on this question, our holding that the Plaintiff can maintain a § 1983 claim against the City, even when the Plaintiff cannot establish that the City's agent is individually liable for his actions, constitutes law of the case.

The "[l]aw of the case rules have developed 'to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.'" *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009) (citing *Casey v. Planned Parenthood of Se. Pa.*, 14 F.3d 848, 856 (3d Cir.1994) (quoting 18 Charles A. Wright, Arthur R. Miller, Edward Cooper, Federal Practice and Procedure § 4478 at 788 (2d ed.1981)).  While the law of the case doctrine is not a restriction on the Court's power to readdress its previous holdings, "as a rule courts should be loath to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice."  *Id.* (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988).

*Washington-Pope I,* at 573. There has been no meaningful change in the law here since the prior opinion.

The Defendant argues that the Court's prior decision relied upon the Third Circuit Court of Appeal's decision in *Fagan v. City of Vineland*, 22 F.3d 1283 (3d Cir. 1994), but that recent Third Circuit appellate decisions, notably *Mulholland v. Gov't Cty. of Berks, Pa.*, 706 F.3d 227 (3d Cir. 2013), *Phillips ex rel. Estate of Phillips v. Nw. Reg'l Commc'ns*, 391 F. App'x. 160, 169 (3d Cir. 2010) and *Bright v. Westmoreland Cty.*, 380 F.3d 729 (3d Cir. 2004), have rejected *Fagan*. *See* Def. Memo at 8-9. As it did previously, the Defendant misreads these cases here.

As a preliminary matter, the opinions in *Mulholland*, *Phillips* and *Bright* were issued before (and, in the case of *Phillips* and *Bright,* well before) this Court's ruling on the previous motions for summary judgment. The City provides no explanation as to why it was unable to bring these cases to the Court's attention during previous rounds of briefing. But even if it had, these cases would have not changed the outcome, given that none of these opinions reject *Fagan* or contradict this Court's ruling in *Washington-Pope I.*

For example, the plaintiffs in *Mulholland v. Gov't Cty. of Berks, Pa.*, brought a § 1983 action against Berks County alleging violations of procedural and substantive due process in relation to an investigation into allegations of child abuse. Plaintiffs argued that the agency's investigation that resulted in the plaintiff being placed on the state child abuse registry was inadequate. 706 F.3d at 238. They further argued that the county failed to notify plaintiff of his listing on the child abuse registry after the investigation, *id.* at 239, and then failed to update the registry with exculpatory information casting doubt on the plaintiff's alleged abusive conduct which came to light later, *id.* at 240. After the district court granted judgment as a matter of law under Federal Rule of Civil Procedure 50(a) in favor of the defendant Berks County, the Third

Circuit Court of Appeals affirmed.  The court found that the plaintiffs had failed to establish the existence of a policy or custom of the county which resulted in a constitutional violation. "Without more, Berks County, the municipality of which BCCYS is simply an agency, cannot be held lability under § 1983 for a single caseworker's alleged deviation from the requirements of the CPSL." *Id.* at 239.  This is not a disputed proposition here.  The opinion also does not address the reasoning in *Fagan* which distinguished the holding in *City of Los Angeles v. Heller*, 475 U.S. 796 (1986).  As explained in *Washington-Pope I,* the Third Circuit Court of Appeals in *Fagan*, reasoned that because the standard for finding an officer liable is different from finding a municipality liable, and focuses on different conduct, a municipality can independently violated the Constitution if it has a policy, practice or custom, through which a specific officer is a "causal conduit."  979 F. Supp. 2d at 576.

The other two cases cited by the Defendant does nothing to challenge such an uncontroversial proposition and do not even address *Monell* directly.  In *Phillips ex rel. Estate of Phillips v. Northwest Regional Communications,* the plaintiff sued Northwest Regional Communications ("Northwest"), a non-profit governmental corporation established to route emergency calls to first responders, as well as several Northwest employees, after a tragic incident where a former Northwest employee shot and killed his ex-girlfriend, her new boyfriend and her sister.  The estate of the boyfriend brought a § 1983 claim, alleging that the former employee had used address information from the Northwest database and received assistance from other call center employees in attempting to locate the home of his victims.  The Court, however, found that there was no evidence that call center employees had any way of knowing the killer's intentions when they provided him directions.  391 F. App'x. at 168-69.  Ultimately the Court determined that the defendants did not deprive the boyfriend of a constitutional right.

*Id.* The Court did not, however, address the existence of a policy or custom on the part of Northwest specifically.

In *Bright v. Westmoreland Cty.*, which involved a similarly tragic set of circumstances, the Third Circuit Court of Appeals reversed a lower court that had found a plaintiff unable to establish that the actions of a county probation office amounted to a "state-created danger" after an individual on probation murdered his daughter. The Court's holding reversing the lower court decision, however, did not address the substance of this case. 380 F.3d at 730. Rather it focused on a single footnote in the appellant's papers, which alerted the Court of Appeals to a significant procedural impropriety in the lower court's management of the case—the district court had indicated in a pretrial conference, prior to the plaintiff filing his response to the defendant's motion to dismiss, of its intention to grant the motion and then subsequently adopted the proposed opinion submitted by defense counsel with only two small changes. *Id.* at 730-31.

Because the Court of Appeals' analysis focused on the lower court's procedure in adopting—practically verbatim—the opinion prepared by the defendants, the Court reproduced it in the body of the opinion. *Id.* at 733-42. The Defendant here makes the mistake of citing, not to the substance of the Court's analysis, but to the text of the proposed opinion submitted by the *Bright* defendants. Def. Memo at 9 (citing *Bright,* 380 F.3d at 736). Moreover, the section cited does not even support the City's argument that without evidence of a specific constitutional violation by a state actor, a plaintiff cannot make out a claim for *Monell* liability against a state agency. All the language of the proposed opinion states is that a state agency does not have an overarching duty to protect individuals from violence committed by third parties. *See Bright,* 380 F.3d at 736 (analyzing the § 1983 liability under a "state-created danger" theory based upon *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)). The Defendant's

argument here conflates this with *Monell* liability, which attaches when the defendant municipality takes some action which constitutes the moving force behind a plaintiff's injury.

Ultimately, the Defendant continues to misunderstand the law of this Circuit as to the significance of our dismissal of the Plaintiff's claims against Officer Bailey. The City's second motion for summary judgment has provided no further justification or reasoning why the Court should reexamine its holding in *Washington-Pope I*.

### c. **Plaintiff's _Monell_ Claims**

Having addressed these two, relatively straight-forward arguments, the Court now turns to the meat of the Defendant's Motion.

The Defendant's principle claim is that the Plaintiff is unable to satisfy her burden of proof under a theory of *Monell* liability. *See* Def. Memo at 9-10. The City provides several arguments in support of this position. First, it argues that the Plaintiff cannot establish the existence of a policy or custom which put the Plaintiff at risk, nor can she establish deliberate indifference to such harm on the part of a policy maker in the police department. Def. Memo at 10. Second, the City argues that the Plaintiff is unable to establish that the department did not adequately supervise, train or discipline its police officers. Def. Memo at 12-14. Finally, the City argues that Officer Washington-Pope has not established that the City's actions caused her injury. Def. Memo at 10.

The Plaintiff responds principally by arguing that the record raises an issue of material fact regarding whether the City was on notice that it either needed to adopt a policy requiring officers to have their diabetes under control prior to being medically approved for service or that a custom existed wherein the department, perhaps passively, but nonetheless volitionally, permitted officers with uncontrolled diabetes to be approved for duty. *See* Memorandum of Law

in Support of Plaintiff's Response to Defendant The City of Philadelphia's Motion for Summary

Judgment, 46-47 (December 26, 2014) (hereinafter "Pl. Memo at __.").[20]  The Plaintiff does not

directly address the Defendant's arguments regarding lack of training or supervision. *See* Pl.

Memo at 60.

A municipality can only be found liable under § 1983 when the municipality itself has

caused a constitutional violation.   *Connick v. Thompson*, 563 U.S. 51, 131 S. Ct. 1350, 1359

(2011); *City of Canton, Ohio, v. Harris,* 489 U.S. 378, 385 (1989); *Monell v. New York City Dept.*

*of Social Services*, 436 U.S. 658 (1978).  "It is well established that municipal liability under

§ 1983 cannot be based on respondent superior."  *Watson v. Abington Twp.*, 478 F.3d 144, 155

(3d Cir. 2007) *Moriarty v. DiBuonaventura*, No. 14-CV-2492 JBS/AMD, 2014 WL 3778728, at

*4 (D.N.J. July 31, 2014).  "It is only when the 'execution of the government's policy or

custom . . . inflicts the injury' that the municipality may be held liable under § 1983." *Harris,*

489 U.S. 385 (citing *Springfield v. Kibbe*, 480 U.S. 257, 267 (1987)); *Monell*, 436 U.S. at 694.

*Monell*, therefore, created a "two track path" for a plaintiff to establish municipal liability under

§ 1983. *McTernan v. City of York*, 564 F.3d 636, 657 (3d Cir. 2009) (quoting *Beck v. City of*

*Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)).

A policy, for purposes of *Monell*, is an official statement or proclamation made by an

individual with the final authority to make such a decision.  *Edwards v. Newton,* No. CIV.A. 11-

7785, 2013 WL 3213340, at *4 (E.D. Pa. June 25, 2013) (citing *Kelly v. Borough of Carlisle*,

622 F.3d 248, 263 (3d Cir. 2010)).  The requirement that the Plaintiff identify a policy "ensures

that a municipality is held liable only for those depravations resulting from the decisions of its

duly constituted legislative body or of those officials whose acts may fairly be said to be those of

---

[20] Plaintiff's Memorandum of law is filed on the ECF docket at document number 36.  The page
numbers refer to the page numbers of the ECF filed document.

the municipality." *Board of Cty. Com'srs of Bryan Cty., Okl. v. Brown,* 520 U.S. 397, 403-04

(1997).  "Official policy often refers to formal rules or understandings—often but not always

committed to writing—that are intended to, and do, establish fixed plans of action to be followed

under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S.

469, 480-81 (1986).  A policy can also exist, however, when the municipal agency affirmatively

decides to not engage in a specific action.  *Thomas,* 749 F.3d at 223.

> [A] policy or custom may also exist where 'the policymaker has failed to act
> affirmatively at all, [though] the need to take some action to control the agents of
> the government is so obvious, and the inadequacy of existing practice so likely to
> result in a violation of constitutional rights, that the policy maker can reasonably
> be said to have been deliberately indifferent to the need.

*Natale v. Camden Cty. Correctional Facility*, 318 F.3d 575, 584 (3d Cir. 2003).

A custom, on the other hand is "defined as [a] practice[] of state officials . . . so

permanent and well settled as to virtually constitute law." *Kelly*, 622 F.3d at 263.  Such a

practice is not formally approved by an appropriate decision maker, but is shown to be "so

widespread as to have the force of law."  *Bryan Cty.*, 520 U.S. at 404.  There is no bright line

rule which establishes how widespread a practice must be, but courts have held that a single

instance is not enough.  *Gwynn v. City of Philadelphia*, 866 F. Supp. 2d 473, 488 (E.D. Pa. 2012)

*aff'd*, 719 F.3d 295 (3d Cir. 2013) ("It is well established that proof of a single instance of

unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the

incident includes proof that it was caused by an existing, unconstitutional municipal policy,

which policy can be attributed to a municipal policymaker.") (citations omitted); *Brown v. City*

*of Pittsburgh*, 586 F.3d 263, 292 (3d Cir. 2009) (citing *City of Oklahoma City v. Tuttle*, 471 U.S.

808, 823 (1985); *Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court

has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice.")

In either instance, however, the municipality must have acted through "an official who has the power to make policy [and] is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." *Green v. Chester Upland School District,* 89 F. Supp. 3d 682, 688 (E.D. Pa. 2015). The Plaintiff must also show that the municipality acted "deliberately" and that this action was the "moving force" behind the Plaintiff's injuries. *Bryan Cty.*, 520 U.S. at 407; *Harris*, 489 U.S. at 389; *Berg v*, 219 F.3d at 275-76; *Kelly v. Borough of Carlisle*, 622 F.3d 248, 263 (3d Cir. 2010). If the policy or custom does not facially violate federal law, causation can be established only by demonstrating that the municipal action was taken with deliberate indifference as to known or obvious consequences—a showing of simple or even "heightened negligence" is not sufficient. *Berg*, 219 F.3d at 276 (3d Cir.2000) *Bryan Cty.*, 520 U.S. at 404.

### i.  Departmental Policy

In order to show the City is liable for Officer Washington-Pope's injuries on the basis of the existence of a governmental policy, the Plaintiff would be required to satisfy three specific elements. First, she must identify the action or decision taken by the government which caused her injury. Second, she must show that the individual or individuals who took the action possessed sufficient authority such that their actions constituted a policy of the municipality. And finally, she must show that the alleged policy was the "moving force" behind her injury.

The Plaintiff argues the department should have instituted a specific policy preventing officers with documented and uncontrolled diabetes from being medically cleared for duty without first being required to visit a specialist in order to bring their condition under control.

*See* Pl. Memo at 47-48. Dr. Robert Swotinsky, an expert witness retained by the Plaintiff, will testify that "the City did not require as a matter of policy (as it should have) that diabetes, once flagged as a concern [. . .] be brought under control by a specialist/endocrinologist." *Id.* at 22 (citing Swotinsky Rep. at 15-16). Dr. Jonathan Williams, another expert retained by the Plaintiff, will testify that the "medical screening process [utilized by City] lacks any appropriate policy for the City of Philadelphia Police Department in not requiring or having the ability to determine if critical recommendation[s] have been followed through." Williams Rep. 3-4; Doc. No. 35 at 30.

The Plaintiff also cites to the testimony from police department sources, including Dr. Hayes, to the effect that Officer Bailey should not have been allowed to serve as a police officer without his diabetes being first stabilized by an endocrinologist. With hindsight, Dr. Hayes indicated that "ideally" it would have been better to have Officer Bailey see a specialist all along. Hayes at 98-100. Deputy Commissioner William Blackburn, the current supervisor of the Police Department's Safety Office, testified that it was his belief that the proper approach would be to not medically clear an officer for duty unless he was able to get his diabetes under control. Deposition of William Blackburn, 37-44 (June 11, 2014) (hereinafter "Blackburn at __").[21] Similarly, John Gaittens, the Deputy Commissioner with oversight over the Safety Office in September 2010, testified that it was his belief that Officer Bailey should have been "washed out" of the academy after he failed to see a specialist to get his diabetes under control, despite instructions from Employee Medical Services to do so. Gaittens at 44. And finally, Captain Melvin Singleton, who had command over Officer Bailey, admitted that the department as a whole was aware of the dangers posed by uncontrolled diabetes. Singleton at 13.

The Plaintiff contends that Officer Bailey was medically approved for duty despite his uncontrolled diabetes as the direct result of deliberate indifference on the part of the government

---

[21] Attached as Exhibit W to Doc. No. 36.

to the risks that he posed.  According to the Plaintiff, the decision to approve Officer Bailey for

duty rested exclusively with Dr. Hayes.  *See* Pl. Memo at 22-23.  Dr. Hayes was, according to the

Plaintiff, the municipal official who wielded policy-making authority on the issue of medical

approval, sufficient to render the entire city liable for his decisions.  As support for this assertion,

the Plaintiff points to the deposition testimony of Deputy Commissioner Gaittens, who stated

that responsibility for determining officer fitness rested solely with Dr. George Hayes, the City's

Medical Director for Employee Medical Services.

> The way that the health screenings are conducted, the policies within the health
> screening, and the way that the determinations are made are within the purview of
> Dr. Hayes and the medical evaluation at 19th and Fairmount.  So no, the police
> department did not have any input into that at all.

Gaittens at 20.

The first issue that needs to be resolved, then, is whether the record raises an issue of

material fact as to whether Dr. Hayes wielded the type of policy-making authority necessary to

render the municipality liable for his decisions.  As the Supreme Court has reiterated, a

municipality is not vicariously liable for the torts of its employees, but rather only when the

municipality itself can be said to have caused the harm in question.  *See Monell,* 436 U.S. at

690; *Bryan Cty.,* 520 U.S. at 403.  While a municipality can only act through individuals, where

one of those individuals' actions is being challenged, it must be shown that he or she was acting

with the authority of the municipality in order for the municipality itself to be liable.

The record does not indicate that Dr. Hayes is an elected official or political appointee

with any sort of statutorily defined authority. The only support that the Plaintiff has provided for

her claim that Dr. Hayes is a policy-maker is the testimony of Mr. Gaittens.  Pl. Memo at 48-49;

Gaittens at 20.  Mr. Gaittens explains in his deposition testimony that, with regard to medical

approvals, "the police department leaves it up to the medically-competent professionals to make

their judgment calls.  The aspects of the background investigation are turned over to different professionals at different times.  For the medical evaluation, that is with Dr. Hayes and his unit." Gaittens at 20-21.

The Supreme Court has held that the determination as to whether a decision maker has authority to make final decisions is a question of state law, not a question of fact for the jury. *Pembaur,* 475 U.S. at 483; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988); *Jett v. Dallas Independent School Dist.*, 491 U.S 701, 737 (1989).  Here, the record on this point does not establish that, under state law, Dr. Hayes had the type of authority contemplated by *Monell*. Absent from the record are any type of written policies, ordinances, rules or laws which could establish the legal basis for Dr. Hayes' authority.  In light of the Plaintiff's failure to include any such material in the record, it is not the Court's task to do so on her behalf.  *See Argyropoulos v. City of Alton*, 539 F.3d 724, 740 (7th Cir. 2008); *see also Perkins v. City of Elizabeth*, 412 F. App'x. 554, 555 (3d Cir. 2011) ("[A] court is not obliged to scour the record to find evidence that will support a party's claims.").[22]

At most, the scant evidence that the Plaintiff has put forward establishes that Dr. Hayes was an employee who was delegated responsibility from the police department to determine the medical fitness of Philadelphia police officers.[23]  While the testimony of Mr. Gaittens does suggest that the department did not intercede in the execution of this delegated authority, it does

---

[22] The Plaintiff cannot sustain her burden of establishing the legal basis for Dr. Hayes' authority by pointing to the scant deposition testimony of Mr. Gaittens.  The Original Document Rule, as laid out in the Article X of the Federal Rules of Evidence, prohibits the Court from relying on the testimony of Mr. Gaittens to prove the contents of a municipal ordinance or rule. *See* Fed. R. Civ. P. 1002; *Shields v. Folsom*, 153 F. Supp. 733, 735 (E.D. Pa. 1957).  The purpose of the best evidence rule is to prevent inaccuracy when attempting to prove the contents of a document.  Here the Court has been provided with no citation to a statute, regulation, ordinance or other official edict which would allow it to evaluate whether Dr. Hayes is or is not imbued with the authority to make decisions for the department

[23] The Court has only been provided with excerpts of the depositions of Dr. Hayes, and other witnesses.  A review of the excerpted sections of Dr. Hayes deposition does not indicate the precise character or source of the authority from which Dr. Hayes' authority derives.

not address whether the police commissioner or other higher department officials retained the

ability to intercede to set policy which Dr. Hayes and his office would be required to follow.

Gaittens at 21, 44-45.  Without some evidence regarding the source of Dr. Hayes's authority, the

Court cannot infer that he had the authority to make policy for the department simply from

testimony regarding the circumstance that the department did not second guess his decisions.

"Simply going along with the discretionary decisions made by one's subordinates" or "the mere

failure to investigate the basis of a subordinate's discretionary decisions" does not amount to the

delegation of policy making authority.  *Praprotnik,* 485 U.S. at 130. For example,

> If city employment policy was set by the Mayor and Alderman and by the Civil
> Service Commission, only those bodies' decisions would provide a basis for city
> liability.  This would be true even if the Mayor and Alderman and the
> Commission left the appointing authorities discretion to hire and fire employees
> and they exercised that discretion in an unconstitutional manner.

*Id.* at 130 (citing *Pembaur*, 475 U.S. at 483 n. 12).  That discretionary decisions made by certain

employees were not reviewed for "substantive propriety" by higher supervisory officials or that

the higher authority gave "substantial deference" to the original decision maker, is not sufficient

to establish the decision maker has been imbued with policy-making authority.  *Id.* at 129.

The Court's holding in *Pembaur,* is instructive.  In the course of an investigation into

alleged welfare fraud by a physician, Dr. Pembaur, several of his employees were subpoenaed to

testify before the grand jury.  When they did not appear, county sheriff's deputies attempted to

serve capiases and take them into custody at their work.  After the deputies were initially refused

entry by Dr. Pembaur and his staff, they contacted their superiors for guidance.  They were

eventually instructed by the county prosecutor, to "go in and get" the witnesses, which they did

after breaking down the door with an ax.  The physician subsequently filed a § 1983 suit against

the city and county, as well as the individual officers, alleging violation of his rights under the

Fourth Amendment.  The trial court dismissed the claims against the city and county on the basis that the instructions from the county prosecutor did not constitute an official policy of the municipality.  The appellate court affirmed, holding that

> Pembaur's claims that the deputy sheriffs acted pursuant to the polices of the Sheriff and Prosecutor by forcing entry into the medical center.  Pembaur has failed to establish, however, anything more than that, on this one occasion, the Prosecutor and the Sheriff decided to force entry into his office. … That single, discreet decision is insufficient by itself to establish that the Prosecutor, the Sheriff, or both were implementing a governmental policy.

*Pembaur*, 475 U.S. at 476-77.  The Supreme Court, however, reversed, holding that "it is plain that municipal liability may be imposed for a single decision by municipal policy makers under appropriate circumstances."  *Id.* at 480.  The Court recognized that a single decision taken by a legislative body will have the effect of establishing policy, pursuant to *Monell*, even when the decision is intended to address a specific situation, which may not repeat in the future.  *Id.*

The Supreme Court's reasoning turned on the fact that the plaintiffs had put forward evidence showing that the county prosecutor was specifically authorized under Ohio law to provide instruction to county officials pertaining to their duties when asked.  *Id.* at 485.  Because the county prosecutor was acting pursuant to his statutory authority as a final decision maker, his instruction to the deputies constituted a municipal "policy" for purposes of the § 1983 suit.  *Id.* We can contrast this with the situation here where the Plaintiff has not provided citation to any state or municipal law granting Dr. Hayes the authority to set policy for the Philadelphia police department regarding officer medical fitness for duty.  Our situation is closer to the counterfactual briefly discussed by the *Pembaur* Court, which noted that it might have been persuaded that the instruction from the county prosecutor would have merely constituted legal advice—albeit legal advice county officials might give serious deference to, given the prosecutor's expertise—had no statutory authority been shown.  *Pembaur*, 475 U.S. at 484. An

analogous situation is presented here, where the record simply establishes that the City and the department choose to defer to the medical decisions of Dr. Hayes, not that they have delegated policy making authority to him.

Consequently, based upon a thorough review of the record, the Court cannot conclude that the Plaintiff has put forward sufficient evidence which tends to show that Dr. Hayes was endowed with the requisite authority to dictate policy on behalf of the department.

The question then, is whether the Plaintiff has put forward sufficient evidence to raise an issue of material fact regarding the existence of a policy despite the fact that Dr. Hayes appears not to be a municipal decision maker.  The Plaintiff's briefing is silent as to any specific individuals, other than Dr. Hayes, who made policy for the department.  Nevertheless, this is not essential. The Third Circuit Court of Appeals has acknowledged that a responsible decision maker does not necessarily need to be specifically identified, given that permanent and well settled practices carrying the force of law can be ascribed to municipal decision makers.  *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996); *Anela v. City of Wildwood*, 790 F.2d 1063, 1067 (3d Cir. 1986); *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).  Therefore, the Court will look to the record to determine whether the Plaintiff can still establish the existence of a question of material fact regarding the department's decision to not establish a policy restricting individuals with uncontrolled diabetes from being approved for duty.

Ms. Washington-Pope relies heavily on *Thomas v. Cumberland Cty.*, 749 F.3d 217 (3d Cir 2014) to support her argument that the command structure of the department acted with deliberate indifference to the risk of its officers causing harm as a result of its failure to institute a policy preventing such officers from serving.  *See* Pl. Memo at 44-46.  In *Thomas* the Third Circuit Court of Appeals considered a § 1983 claim alleging that a county corrections department

had failed to provide its employees with adequate training in conflict de-escalation and

intervention.  The plaintiff in *Thomas*, while incarcerated in a county corrections facility, was

assaulted by other inmates in the presence of two corrections officers.  The district court granted

summary judgment in favor of the county and the corrections officer.  The Court of Appeals

reversed the district court's grant of summary judgment in favor of the defendants. In finding

that the county's failure to provide training constituted "deliberate indifference" to a "known or

obvious risk" the Court relied upon the fact that Mr. Thomas put forward evidence that fights in

the prison were a regular occurrence.  *Id.* at 223-4.  In light of the volatile nature of the prison,

the Court found a reasonable jury could conclude that failure of the county to provide its officers

with specific tools to handle situations expected to occur frequently, such as inmates fighting,

could lead to constitutional violations based upon these officers' failure to protect those same

inmates.  *Id.* at 225.

      The Court finds *Thomas,* and the line of cases it draws upon, instructive to the analysis

here.  Prior to *Thomas*, Supreme Court explained in *City of Canton, Ohio v. Harris*, that failure

on the part of a municipality to address an obvious issue which is expected to occur repeatedly

can serve as the basis of liability.

> It may seem contrary to common sense to assert that a municipality will actually
> have a policy of not taking reasonable steps to train its employees. But it may
> happen that in light of the duties assigned to specific officers or employees the
> need for more or different training is so obvious, and the inadequacy so likely to
> result in the violation of constitutional rights, that the policymakers of the city can
> reasonably be said to have been deliberately indifferent to the need.  In that event,
> the failure to provide proper training may fairly be said to represent a policy for
> which the city is responsible, and for which the city may be held liable if it
> actually causes injury.

489 U.S. at 390.  Subsequent case law from this Circuit echoes this rule.  *See Natale*, 318 F.3d at

585 ("A reasonable jury could conclude that the failure to establish a policy to address the

immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs"); *Berg v. Cty. of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000) (denying summary judgment motion based upon plaintiff's showing that he was wrongly arrested as a result of a "flawed warrant creation practice" which failed to include any checks to prevent typographical errors from leading to wrongful arrests); *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1074 (3d Cir. 1991) (holding that the record could establish a finding that the City's failure to implement measures to prevent suicides of intoxicated individuals in prison, amounted to deliberate indifference to known and obvious risks).

Plaintiff here has designated five expert witnesses, three of whom are expected to testify regarding departmental command structure and awareness within the department of the risk an officer with uncontrolled diabetes would pose. Pl. Memo at 28. Dr. Williams will testify as to the severity of Officer Bailey's condition and that no policy was in place to prevent officers with uncontrolled diabetes, such as Officer Bailey, from serving. Dr. Swotinsky will testify that, not only was the Philadelphia Police Department aware of the dangers posed by those with uncontrolled diabetes, they provided their officers with training specifically on how to minimize those risks. This training included instruction that individuals with uncontrolled diabetes can suffer mental status changes and exhibit violent behavior. Likewise, Frank Wallace, a 30-year veteran of law enforcement and the Philadelphia police department and former Director of Public Safety for Woodbridge, New Jersey, intends to testify that "the command structure of the Philadelphia Police Department and the City's Medical Authorities had adequate warning of Officer Bailey's diabetic condition, its uncontrolled nature, the danger that it presented to the citizens of Philadelphia, and Officer Bailey's propensity for not taking his medication" prior to

the incident with Officer Washington-Pope.  Wallace Rep. at 32. He explains that given Captain Singleton's awareness of Officer Bailey's prior diabetic episodes, in Mr. Wallace's expert opinion, the department command structure was aware of Officer Bailey's uncontrolled condition prior to the incident with Officer Washington-Pope.

Officer Washington-Pope has put forward evidence through her expert witnesses that the command structure of the Philadelphia Police Department was aware of the potentially serious risks associated with uncontrolled diabetes but failed to institute a policy to ensure such risks were minimized.  The record also establishes that the command structure of the department was aware that Officer Bailey specifically suffered from uncontrolled diabetes and that his condition was so serious that he was hospitalized at least three times between May 2009 and September 2010.

The Court finds that a failure to train police officers or provide medical services to prisoners is analogous to Philadelphia's failure to require its police officers medically stabilize their diabetes prior to being approved for service.  In *City of Canton* and *Thomas,* the municipalities failed to prepare officers to perform their jobs in a safe and legal manner despite the defendants' awareness of the risk of situations arising which would implicate the need for such training. The alleged failure of the City of Philadelphia in this case likewise involved a policy of not instituting preventative measures to ensure the City's officers were equipped to minimize a known and obvious risk.  Just as fights are not uncommon in prison, diabetes is hardly an uncommon affliction in this country.  It is so common, and so serious, that the State of California, for example, prevents its officers from serving if they have experienced a hypoglycemic episode in the last five years.  Swotinsky Rep. at 5 (citing Goldberg R. Spilberg S. Weyers S. Medical Screening Manual for California Law Enforcement, California Commission

on Peace Officer Standards and Training (2004)).  A reasonable jury could find here that police officers suffering from uncontrolled diabetes constituted a "known and obvious risk" to the public and their fellow officers and the department's failure to establish a policy preventing individuals with uncontrolled diabetes from serving as police officers constituted a "particularly glaring omission" in their medical approval process.

That the record fails to include any other examples of police officers experiencing hypoglycemic episodes on the job does not change the analysis.  *Thomas* and *City of Canton* explain that deliberate indifference to a known or obvious risk can be shown even when the record contains just a single instance of that risk occurring.  *See Thomas,* 749 F.3d at 223; *see also City of Canton*, 489 U.S at 390 n. 10.   The Supreme Court in *City of Canton* explained that liability in such instances depends upon the likelihood that the situation with reoccur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights.  *Id.*  The record here indicates that the department was aware that individuals with uncontrolled diabetes would experience recurrent hypoglycemic episodes which could involve the individual losing command of his faculties and consequently posing a risk of injury to others.  Despite the awareness of this predicable and recurrent risk, the record indicates that the department did not institute a policy to address it.

The City has not mustered any evidence to contradict the facts and arguments put forward by the Plaintiff.  Rather, the City argues that departmental policymakers could not have been deliberately indifferent to the risk of police officers suffering from violent outbursts as a result of uncontrolled diabetes because there are no other recorded incidents comparable to the one at issue.  Def. Memo at 13.  The evidence in the record, however, tends to show that the department's command structure was aware of the dangers of uncontrolled diabetes generally, as

well as Officer Bailey's experience specifically.  The City does not put forward any evidence

which tends to dispute this.  The record also states that, despite this knowledge, the department

chose not to institute a policy to ensure that its officers were not approved for duty if they

suffered from uncontrolled diabetes.  While the fact that no other incidents of officers

experiencing hypoglycemic breakdowns may support a jury's eventual determination that the

City was not deliberately indifferent to the risk posed by Officer Bailey, given the showing by

the Plaintiff's experts regarding the department's awareness of the risk and failure to act in spite

of that awareness, a triable issue of material fact has been raised as to the existence of a

departmental policy.

### ii.  **Departmental Custom**

The decision to institute a policy (or the affirmative decision not to institute a policy as

was argued here) is not the only way one can impose municipal lability under § 1983.  The

Plaintiff has also argued that her injuries are the result of an unlawful custom in the department.

Looking at the elements required to show a "custom," however, the Court cannot find that the

Plaintiff has put forward evidence raising an issue of material fact as to the existence of a custom

of approving diabetics for duty despite the dangers they cause.  The record simply does not

contain sufficient examples of the department acquiescing to the improper conduct of

subordinates in order to establish a custom.

Unlike a policy, which typically implies a course of action consciously chosen among

various alternatives, *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985), a custom is less

definitive and may be inferred based upon evidence that a decision maker has acquiesced to the

"longstanding habits" or "widespread and persistent" conduct of her subordinates, *Adickes v. S.

H. Kress & Co.*, 398 U.S. 144, 166-67 (1970).  The critical issue that the Plaintiff must establish

is that the offending custom or practice was "so widespread" that the policy making officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice. *Berg*, 219 F.3d at276; *see Connick v. Thompson*, 563 U.S. 51, 131 S. Ct. 1350, 1359 (2011). Taking each of Officer Bailey's hypoglycemic breakdowns and subsequent return to duty as a separate instance of departmental acquiescence to subordinate error, at most, the record contains three examples of the alleged custom prior to the September 24, 2010. While the Court finds that the evidence of the department's failure to act in the face of a known and obvious risk is sufficient to allow a reasonable jury to conclude the existence of a policy, the approval of Officer Bailey for duty, despite his diabetes, it is not enough to establish the existence of a departmental custom. *See Gwynn v. City of Philadelphia*, 866 F. Supp. 2d 473, 488 (E.D. Pa. 2012) *aff'd,* 719 F.3d 295 (3d Cir. 2013); *Brown v. City of Pittsburgh*, 586 F.3d 263, 292 (3d Cir. 2009) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985); *Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014).

The evidence in the record demonstrates that Officer Bailey's hypoglycemic breakdowns were unprecedented in the history of the department. The Plaintiff does not present any evidence of other officers being approved for duty in spite of their uncontrolled diabetes or that other officers experienced similar hypoglycemic episodes. At his deposition, Dr. Hayes testified that he was not aware of a similar case the in the 28 years he has worked for the City. Hayes at 43-44. Given that Officer Bailey's experience was unique, it cannot be said that the fact that the department approved him for duty despite evidence that his diabetes was not controlled constituted acquiescence by the policy makers at the department to an unlawful practice by their subordinates that was so widespread as to carry the force of law.

The Plaintiff argues Officer Bailey's three on-the-job episodes of hypoglycemic breakdown prior to the incident with Officer Washington-Pope, and the City's decision to allow him to continue working despite this, is sufficient to establish a custom of the department. Pl. Memo at 56-57. Each of these three episodes indicate that Officer Bailey did not have his diabetes under control in the time period leading up to the incident with Officer Washington-Pope. After each the City referred Officer Bailey to Dr. Hayes to be cleared prior to returning to duty. The Plaintiff argues that the Court can find the existence of a custom at the department based upon the department's reaction to these three incidents. The case law cited by the Plaintiff, however, is inapplicable or involves facts distinguishable to those at issue.

In *Beck v. City of Pittsburgh*, 89 F.3d 996 (3d Cir. 1996), the Third Circuit Court of Appeals reversed a district court decision granting defendant's judgment as a matter of law. Plaintiffs had brought a claim against a police officer and the City of Pittsburgh, alleging police brutality following an arrest for driving under the influence. The plaintiffs argued that the officer in question had five prior, reported civilian complaints in the years leading up to the event at issue, which involved similar allegations of excessive force and verbal abuse by the defendant officer. *Id.* at 973. All but one of these complaints had been investigated (and ultimately denied) and then transmitted through the department chain of command to the Chief of Police. In addition, the record indicated that failure to discipline officers for use of excessive force was a department-wide problem which extended beyond just the defendant officer in question. The record showed that that despite the implementation of a civilian complaint procedure, the department's own annual report had acknowledged that actual discipline resulting from complaints of excessive force department-wide was "very low." *Id.* at 970. Based on this record, the Court of Appeals held that the Chief of Police knew, or should have known, that the

36

defendant officer posed a risk to the public but that the department nevertheless acquiesced to a custom of tolerating the tacit use of excessive force by its officers.  *Id.* at 975.

While the Plaintiff seeks to analogize *Beck*, the record there included substantially more evidence to allow that court to find an issue of material fact for the jury.  The circuit court in *Beck* reversed the lower court's grant of summary judgment in light of a record which included reports of five instances of excessive force by the defendant officer in *Beck*.  This is not substantially more than the three instances of hypoglycemic breakdown present here.  Rather, the record in *Beck* shows that the practice of failing to discipline officers who engaged in excessive force extended beyond the defendant officer specifically at issue. The Court cites to a department OPS report which notes that "use of force has been an issue in the past.  Actual discipline for excessive force is low."  *Beck* at 970.  While the Plaintiff would have us read this decision to stand for the principle that evidence of five examples of unpunished use of excessive force is sufficient to establish a custom within a police department, the factual record in *Beck,* as relayed by the Third Circuit, does not support such an inference.

In *Fletcher v. O'Donnell*, 867, F.2d 791 (3d Cir. 1989) the Court of Appeals also analyzed when a municipality could be liable under § 1983 for alleged excessive force by a police officer.  After trial, where the plaintiff had been prohibited from presenting evidence of the officer's history of excessive force, the appellate court reversed, holding that this exclusion had been improper.  The court noted that while a single incident by a lower level employee acting under color of law does not establish either an official policy or custom, a custom could be established by showing a pattern by policy makers in the department acquiescing to the officer's use of excessive force.  *Id.* at 793-94.  This rule is consistent with this Court's holding; the

Plaintiff, however, has simply failed to put forward evidence raising an issue of fact as to the existence of a pattern of department acquiescence.

### iii.  **Department Failure to Supervise or Train**

In addition to arguing that the Plaintiff has failed to raise an issue of material fact regarding the existence of a policy or custom related to the medical approval of Officer Bailey for service, the Defendant also argues that the Plaintiff has failed to raise an issue of material fact as to the City's failure to train or supervise its officers.  Def. Memo at 12-15.

In order to establish a municipality's liability based upon its failure to supervise or train its employees, the Plaintiff must identify "a specific supervisory practice or procedure" that the Defendant failed to employ, and establish that without this practice or procedure, the department's policy or custom created an unreasonable risk of the ultimate injury, the supervisor was aware that this unreasonable risk existed, the supervisor was indifferent to the risk and the violation by the officer was the result of the supervisor's failure to employ the identified supervisory practice or procedure.  *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989); *see City of Canton*, 109 S. Ct. at 1205.  The Court of Appeals in *Sample v. Diecks* emphasized that "it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did."  885 F.2d at 1118.

In her response, the Plaintiff does not address the issue of the department's failure to train or supervise its officers separately from her argument regarding the existence of a policy or custom which allowed Officer Bailey to be approved for duty despite his uncontrolled diabetes. The Plaintiff did argue at points that the department should be liable for its failure to supervise Officer Bailey, *see* Pl. Memo at 47, but to the extent that she specifically identified any alleged supervisory failures, these are simply a re-assertion of her previous arguments as to the

department's policy of allowing individuals to serve despite their uncontrolled diabetes.  The Plaintiff's briefing does not put forward evidence that tends to establish the existence of any different policy or custom.  To the extent that the Plaintiff therefore intends to argue that the city is liable for injuries based upon a separate supervisory practice or procedure, the Court finds that the Plaintiff has failed to raise an issue of material fact.

### iv.  <u>Causation</u>

Having determined that the Plaintiff has raised an issue of material fact regarding the existence of a policy existing within the department, the Court must next determine whether this policy was the "moving force" behind the Plaintiff's injuries. *Brown*, 520 U.S. at 404 ("As our § 1983 municipal liability jurisprudence illustrates, however, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The Plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."); *City of Canton*, 489 U.S. at 389.  The Plaintiff must establish that the department's action was performed with the requisite degree of culpability and must establish the existence of a direct causal link between the policy and the depravation of rights.  *Stanley v. City of Pittsburgh*, 467 F. App'x. 132, 133 (3d Cir. 2012).  The requisite culpability is more than mere negligence; the harm suffered must have been a known or obvious consequence of the department's policy.  *Brown*, 520 U.S. at 404; *Stanley,* 467 F. App'x. 133; *Berg*, 219 F.3d at 276.

The Defendant does not argue the substance of this issue in its papers.  Rather the argument presented amounts to simply stating that there was no policy to have caused the Plaintiff's injuries.  *See* Def. Memo at 17.

The Plaintiff has put forward evidence tending to establish certain injuries sustained by the Plaintiff as a result of her interaction with Officer Bailey on the evening of September 24,

2010. The record indicates that the department allowed Officer Bailey to continue carrying his service weapon, despite the fact that the department was aware of his uncontrolled diabetes and aware that his condition could lead to erratic and potentially violent behavior.  As discussed above, based upon the record, a reasonable jury could find that the Defendant was deliberately indifferent to the risk to the Plaintiff.

In addition, the Plaintiff has presented evidence from her expert, Stephanie Samuels, a psychotherapist, which tends to show that Officer Washington-Pope's injuries were the direct result of Officer Bailey's erratic and violent behavior.  Ms. Samuels has submitted a report which opines the Plaintiff suffers from post-traumatic stress disorder, panic attacks, and major depression as a result of Officer Bailey holding her at gunpoint.  The evidence put forward creates an issue of material fact regarding both the municipality's degree of culpability as well as the causal link between the policy and the Plaintiff's injuries.  The evidence establishes that the department command structure was aware that individuals with uncontrolled diabetes could act erratically or violently.  Swotinsky Rep. at 1; Wallace Rep. at 36.   The record also contains evidence which tends to show that the department command structure was aware of the fact that Officer Bailey was experiencing serious on-duty hypoglycemic breakdowns.  Despite this acknowledged danger, the department failed to require its officers seek medical care to bring their diabetes under control.  The Court finds that the Plaintiff has raised an issue of material fact as to whether the department was acting with deliberate indifference to the risk(s) that an officer with uncontrolled diabetes would cause.  Moreover, the Court finds that the Plaintiff has presented evidence which tends to show that Officer Washington-Pope's injuries were the result of Officer Bailey's erratic and violent behavior on duty, stemming from the department's failure to require he bring his diabetes under control.

**V.**     **CONCLUSION**

For the foregoing reasons, the Court agrees with the City of Philadelphia that Plaintiff cannot bring a Fifth Amendment Due Process claim against the City and that the record does not support a finding that a custom existed within the department, which caused the Plaintiff's injuries.  The Court, however, finds that the Plaintiff has raised an issue of material fact regarding the existence of a policy of not requiring officers bring their diabetes under control prior to being approved for duty.  Consequently, the City of Philadelphia's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

\*    \*    \*

An Order consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge